## STATE OF CONNECTICUT *v.* EDDY E. WOOLCOCK, JR.
### (12324)

PETERS, C. J., HEALEY, SHEA, DANNEHY and CALLAHAN, Js.

Argued October 3—decision released December 23, 1986

*Timothy H. Everett,* with whom, on the brief, were *John W. O'Meara, Charles E. Oman* and *Toby R. Moore,* certified legal interns, for the appellant (defendant).

*Susan C. Marks,* deputy assistant state's attorney, with whom, on the brief, were *Walter D. Flanagan,* state's attorney, *Richard Arconti,* former assistant state's attorney, and *Karen G. Picker,* legal intern, for the appellee (state).

ARTHUR H. HEALEY, J. After a trial to the jury, the defendant, Eddy E. Woolcock, Jr., was found guilty of one count of attempted murder in violation of General Statutes §§ 53a-49 and 53a-54a, one count of assault on a peace officer in violation of General Statutes § 53a-167c (a) (1), and four counts of the sale of a narcotic substance (heroin) in violation of General Statutes § 19-480 (a). This appeal followed.

On appeal, the defendant claims that the trial court erred: (1) in depriving him of a fair trial before an impartial jury because it required him to remain in shackles throughout the trial and allowed armed and uniformed state troopers to be present at the trial where there was no reasonable necessity for such extraordinary security measures; (2) in depriving him of a fair trial before an impartial jury under the federal and state constitutions by giving an unexpected preliminary instruction to the jury after the state's first witness was sworn; (3) in instructing the jury that he could be found guilty of assault upon a peace officer in disregard of what it said was "the literal meaning of the statute" involved, General Statutes § 53a-167c (a) (1); and (4) in failing, in violation of the state constitution and Practice Book § 919 (3), to inquire personally of the defendant before imposing sentence to ascertain whether he wished to avail himself of his "right" of allocution.[1] We find no error.

Among the facts that the jury could reasonably have found are the following: For several months prior to August, 1982, Bethel police officer Mark Fitzgerald worked undercover with the statewide narcotics task force; his duties included purchasing illegal narcotics from suspected dealers in the Danbury area. Fitzgerald first met the defendant on August 19, 1982, when,

[1] The defendant withdrew this fourth claim during oral argument before this court.

accompanied by an informant, he went to the defendant's Danbury apartment and purchased $50 worth of heroin. At that time, the defendant indicated to Fitzgerald that he owned a nine millimeter Smith and Wesson handgun. On three subsequent occasions, August 23, 1982, August 30, 1982, and September 3, 1982, Fitzgerald went alone to the defendant's apartment and on each occasion the defendant sold him heroin for the sums of $50, $25 and $50 respectively.

During the August 30, 1982 meeting, the officer asked the defendant if he still had the handgun. The defendant said that he did. The defendant refused Fitzgerald's offer to buy the gun, but when Fitzgerald asked if the defendant could obtain one for him, the defendant indicated that he could get one for him at "a good price." On September 3, 1982, the defendant told him that he could get him a gun that would not be "traceable" but that it would take "approximately a week's time." On September 13, 1982, the defendant and Fitzgerald again discussed getting a handgun, and the defendant told Fitzgerald to contact him in another week. During that conversation, the officer saw a nine millimeter Smith and Wesson handgun "stuck down in [the defendant's] pant leg on the left side." On September 17, 1982, the defendant told Fitzgerald that he would have a gun for him on September 20, 1982.

At about 8 p.m. on September 20, 1982, Fitzgerald arrived at the defendant's apartment. Cynthia Tollman, the defendant's girlfriend, answered the door and told Fitzgerald that the defendant was probably in the parking lot adjacent to the apartment complex. As Fitzgerald walked toward the parking lot, a woman, Phyllis Jackson, called, "Hey you" to Fitzgerald and upon walking up to him, she said, "Oh, I thought it was you." Although he said nothing, Fitzgerald recognized her as the occupant of a motel room in Bethel where he

had executed a search and seizure warrant in 1981. As he continued walking, he heard Tollman call to Jackson. Jackson then walked toward the defendant's apartment. Unable to locate the defendant, Fitzgerald left the area.

About ten or fifteen minutes later, Fitzgerald returned to the parking lot, saw the defendant and asked about the gun. The defendant, who appeared nervous, indicated to him that the "heat was on," that police were in the area. The defendant told Fitzgerald to come back alone at 10 p.m. when it would be dark enough to make the gun transaction.

At approximately 8 p.m., the defendant's father came to the apartment and had a conversation with the defendant. Brian Robinson, Tollman's cousin, was present at the defendant's apartment at that time but he did not hear the conversation. Phyllis Jackson was also at the apartment and, referring to Fitzgerald, said to the defendant: "That cop's a narc," to which the defendant said: "I am going to ice that narc." The defendant thereafter left the apartment. He returned about 10 p.m. and made arrangements for Robinson to meet him at a nearby playground and to take a gun which the defendant would give him to deliver to the defendant's father at the post office. The defendant and Robinson then left, Robinson going to the playground as arranged.

At about 10 p.m., Fitzgerald returned to the parking lot. Fitzgerald got out of his car but the defendant indicated to him to get back inside, which he did. Through the open window on the driver's side of the car, Fitzgerald saw that the defendant had a glove on his right hand. The defendant appeared nervous and said that there were police in the area. After the defendant turned down Fitzgerald's suggestion not "to do the deal," Fitzgerald withdrew the $300 for the gun from his pocket. As he turned toward the defendant, he saw

the muzzle of a handgun and a flash. He felt a "very hard slap" to the side of his face and heard "a popping noise" which he recognized as a handgun going off. He realized that he had been shot. He opened the car door on the passenger side, fell to the pavement, then ran to a nearby parking lot where by prearrangement his backup officers were located. They took him to the Danbury Hospital where medical treatment, including surgery, was given.[2]

While Robinson was waiting for the defendant at the playground, he heard "a pop." After that, the defendant ran up to Robinson, put the gun in a handkerchief, and gave the gun to Robinson. Robinson put the gun in his pocket. As planned, Robinson took the gun to the post office and gave it to the defendant's father. Approximately thirty minutes later, the defendant was arrested. Subsequently, atomic absorption testing revealed levels of barium and antimony indicative of gunshot residue on the defendant's hands.

I

We turn first to the claims concerning the retention of shackles on the defendant at his trial and the presence of "armed and uniformed state troopers" at trial for which the defendant maintains there was no reasonable necessity. The defendant claims that the trial court abused its discretion in denying his pretrial motions that he not be shackled while in the courtroom, that any state troopers in the courtroom be in plain clothes, and that no firearms be permitted in the courtroom. He argues that the trial court's ruling "could have

---

[2] The surgeon who treated him testified that he initially believed Fitzgerald was "a goner" and that he performed a tracheotomy that night to assist his breathing. He also said that in his opinion the officer would not have survived if the tracheotomy had not been performed "within the next two, three minutes." He remained in the hospital for twenty-three days and his treatment included an operation to reconstruct his jaw which included wiring his jaw together to stabilize the broken bone fragments.

created prejudice in the minds of the jury." He also contends that his constitutional right to appear at his trial clothed with the indicia of innocence was impaired because the record discloses no reasonable necessity for the extraordinary security measures taken.[3] We are not persuaded.

Certain factual circumstances relating to these claims should be set out. On June 7, 1983, just prior to the commencement of the trial, the defendant made certain motions pertaining to courtroom security. Specifically, the defendant requested that he not be shackled, that any state troopers present in the courtroom during the trial be dressed in plain clothes rather than in uniform, and that "firearms not be allowed in the courtroom." The prosecutor, responding to these motions, simply said: "The initial discretion with Mr. Woolcock's record is such there is a security risk and I think appropriate caution should be taken." The court stated that the defendant "will be shackled all of the time he is away from [the Bridgeport Correctional] Center. There is a skirt that has been installed on the tables. Should the jury see the shackles, it will be because Mr. Woolcock caused it to happen and for no other reason. If he chooses to do that he is doing it because of no one else." The court, however, reserved decision on the issue of troopers in the courtroom as well as "firearms being evident."

---

[3] On his "reasonable necessity" contention, the defendant refers to Practice Book § 892 which provides:

"Upon the direction of the judicial authority, a defendant may be removed from the courtroom during his trial when his conduct has become so disruptive that the trial cannot proceed in an orderly manner. Reasonable means of restraint may be employed if the judicial authority finds such restraint reasonably necessary to maintain order. If the judicial authority orders such restraint, he shall enter into the record of the case the reasons therefor. Whenever physical restraint of a defendant occurs in the presence of jurors trying the case, or whenever the defendant is removed, the judicial authority shall instruct the jurors that such restraint or removal is not to be considered in assessing the evidence or in determining guilt or innocence."

On June 8, 1983, prior to the presentation of any evidence at the trial, the defendant renewed his motion concerning the presence of any uniformed and armed state troopers in the courtroom. At that time, the prosecutor elaborated on his remarks of the preceding day "concerning the defendant's record and the need for the security." He then said that the record showed a 1979 class C felony of escape from custody which resulted in a sentence to Somers state prison, as well as a 1977 conviction for assaulting a police officer. The prosecutor pointed out that the escape in question had "occurred in this very courthouse; obviously a relevant consideration and the nature of the charge in this instance." He argued that "all these facts together present a serious risk security-wise and I think the precautions that have been taken are warranted." The defendant repeated his prior claims, maintaining that "sufficient security with weapons can be done with the weapons outside of the courtroom in front of the doors . . . ." The court denied the defendant's motion concerning troopers and repeated its ruling on the defendant's restraints, stating clearly that if the defendant chose to testify, the jury would be excused, the shackles removed and that he could proceed to testify without them. In addition, the court again discussed the precautions taken of "skirting of the two tables [state and defense] with the material that either does not admit light or vision behind it and adequately screens the jury from any view of Mr. Woolcock's legs or the restraints thereon."[4] The court reiterated that if the jury became aware of the restraints, it would be because of the defendant's actions. The defendant duly excepted.

---

[4] At that time, the trial court said: "The Court's ruling on restraints on Mr. Woolcock will stand as the Court said yesterday afternoon. Mr. Dimyan, if he chooses to testify the jury will be excused; the restraints will be removed and he will have freedom of movement to the stand and freedom of movement on the stand. I also said if the restraints become obvious to the jury, and the precautions that have been taken, that is, skirting of the

During the trial and in the absence of the jury, the trial court introduced as court exhibits five Polaroid pictures for the purpose of enabling a reviewing court "to see exactly what the draping arrangement [of the state and defense tables] was." These exhibits which we have examined show not only the state's table but several views of the defense table. Both tables were draped.

At the trial, the defendant elected to testify. The setting in which he did so bears on the issue at hand. The jury had been excused for some time while another witness was being examined on the voir dire. When that witness was excused, the defendant's counsel informed the court that the defendant would be the next witness. The court ordered the shackles removed, the jury then came in and the defendant testified. The jury was excused when he finished and, in their absence, the defendant returned to the defense table where he was reshackled. During his cross-examination he admitted that he had been convicted of escape from custody in August, 1979, for which he had received a sentence of two and one-half to six years.

It would appear that there was at least one state trooper at the trial. We note that the record does not disclose how many troopers were present, how they were armed or clothed, or where they were deployed in the courtroom. No offer of proof going to this issue was ever made by the defendant.

"As a general proposition, a criminal defendant has the right to appear in court free from physical restraints. . . . Grounded in the common law, this right evolved in order to preserve the presumption favoring a crimi-

---

two tables with the material that either does not admit light or vision behind it and adequately screens the jury from any view of Mr. Woolcock's legs or the restraints thereon. Should the jury become aware of them it will be an act that Mr. Woolcock produces it, that if he chooses to produce it then unfortunately the consequences are his to bear. . . ."

nal defendant's innocence, while eliminating any detrimental effects to the defendant that could result if he were physically restrained in the courtroom." (Citations omitted.) *State* v. *Williams,* 195 Conn. 1, 5–6, 485 A.2d 570 (1985). "The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment. *Drope* v. *Missouri,* 420 U.S. 162, 172, 95 S. Ct. 896, 43 L. Ed. 2d 103, 113 (1975). The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." *Estelle* v. *Williams,* 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126, reh. denied, 426 U.S. 954, 96 S. Ct. 3182, 49 L. Ed. 2d 1194 (1976). In order to implement that presumption, "courts must be alert to factors that may undermine the fairness of the fact-finding process. In the administration of criminal justice, courts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)." *Estelle* v. *Williams,* supra. Put another way, for the presumption to be effective, "courts must guard against practices which unnecessarily mark the defendant as a dangerous character or suggest that his guilt is a foregone conclusion." *Harrell* v. *Israel,* 672 F.2d 632, 635 (7th Cir. 1982).

The right of a criminal defendant to appear at trial free from physical restraints is not, however, without limits. See, e.g., *Illinois* v. *Allen,* 397 U.S. 337, 344, 90 S. Ct. 1057, 25 L. Ed. 2d 353, reh. denied, 398 U.S. 915, 90 S. Ct. 1684, 26 L. Ed. 2d 80 (1970); *United States* v. *Hack,* 782 F.2d 862, 867 (10th Cir.), cert. denied sub nom. *Owens* v. *United States,* 476 U.S. 1184, 106 S. Ct. 2921, 91 L. Ed. 2d 549 (1986); *Woodards* v. *Cardwell,* 430 F.2d 978, 982 (6th Cir. 1970), cert. denied, 401 U.S. 911, 91 S. Ct. 874, 27 L. Ed. 2d 809 (1971); *State* v. *Williams,* supra, 7; see *Corey* v. *State,*

126 Conn. 41, 9 A.2d 283 (1939). A trial judge " 'has a duty to do what may be necessary to prevent escape, to minimize danger of harm to those attending trial as well as to the general public, and to maintain decent order in the courtroom.' " *State* v. *Williams,* supra, 6, quoting *Commonwealth* v. *Brown,* 364 Mass. 471, 475, 305 N.E.2d 830 (1973). Shackles may properly be employed in order to ensure "the safe, reasonable and orderly progress of trial." *United States* v. *Theriault,* 531 F.2d 281, 284 (5th Cir.), cert. denied, 429 U.S. 898, 97 S. Ct. 262, 50 L. Ed. 2d 182 (1976); *Zygadlo* v. *Wainwright,* 720 F.2d 1221, 1223 (11th Cir. 1983), cert. denied, 466 U.S. 941, 104 S. Ct. 1921, 80 L. Ed. 2d 468 (1984). "When a 'reasonable necessity' exists the trial court may employ reasonable means of restraint upon a criminal defendant. [*Corey* v. *State,* supra, 42–43]; Practice Book § 892; see *Illinois* v. *Allen,* supra, 350 (Brennan, J. concurring)." *State* v. *Williams,* supra, 7. In *Williams,* we pointed out that "[w]hen either ordering the use of restraints or refusing to remove them, the trial court must ensure that the reason for their employment is detailed in the record. Practice Book § 892; *Kennedy* v. *Cardwell,* [487 F.2d 101, 107 (6th Cir. 1973), cert. denied, 416 U.S. 959, 94 S. Ct. 1976, 40 L. Ed. 2d 310 (1974)]; *People* v. *Duran,* [16 Cal. 3d 282, 291, 545 P.2d 1322, 127 Cal. Rptr. 618 (1976)]; *Commonwealth* v. *Brown,* [364 Mass. 471, 479, 305 N.E.2d 830 (1973)]; *Flowers* v. *State,* 43 Wis. 2d 352, 363, 168 N.W.2d 843 (1969)." *State* v. *Williams,* supra, 7–8. We are mindful that courts must indulge every reasonable presumption against the loss of constitutional rights. *Illinois* v. *Allen,* supra, 343. "An adequate record demonstrating the necessity for the use of the restraints imposed is essential to meaningful appellate review . . . ." *State* v. *Williams,* supra, 8. This is particularly so because of the potential for prejudice in the use of shackles. Id.

In reviewing the defendant's claims concerning shackling, our standard of review is whether the trial court abused its sound discretion in acting as it did. Id. The trial court's discretion on the issue of shackling is "broad." Id.; see also *Commonwealth* v. *Brown,* 364 Mass. 471, 476, 305 N.E.2d 830 (1973). It is for the trial court to consider all the circumstances to accommodate fairly the defendant's right to the indicia of innocence before the jury as well as the competing rights of participants in the courtroom and society at large. *United States* v. *Samuel,* 431 F.2d 610, 615 (4th Cir. 1970); *State* v. *Williams,* supra, 8, 9. If restraints appear potentially necessary, it is desirable, when circumstances permit, to conduct an evidentiary hearing in the absence of the jury. See *Kennedy* v. *Cardwell,* supra; *Woodards* v. *Cardwell,* supra; *People* v. *Duran,* supra; see also A.B.A., Standards for Criminal Justice (1982) c. 15, § 4.1 (c).

In this case, the nature of the security measures ordered by the court did not constitute, under all the circumstances, an abuse of discretion. Initially, we point out that on June 7, 1983, all that the record fairly demonstrated was the prosecutor's unadorned statement that the defendant's record showed that he was a "security risk" and that "appropriate caution should be taken." All the trial court said, in ordering the shackling, was that a "skirt has been installed on the tables" and that if the jury saw the shackles, it would be because the defendant himself caused that to happen. Even if we find the court's order on June 7, 1983, deficient because of the lack of an adequate record, any conceivable error in the order was certainly harmless under all the circumstances. No evidence was presented before the jury on that day. The skirts around the tables, which were described in great detail later during the trial, were already in place. There is simply no evidence that the jury saw the shackles at any

time during the trial. Although it certainly would have been the better practice to have put the defendant's past record explicitly before the court at the time of the defendant's motion, we note that, in exercising its discretion on a matter of this sort, the trial court may rely on information other than formally admitted evidence. The court's knowledge may properly stem from official records, what law enforcement officers have told the court, or the court may take judicial notice of facts generally known within the limits of its jurisdiction. *State* v. *Moen,* 94 Idaho 477, 479, 491 P.2d 858 (1971); *State* v. *McKay,* 63 Nev. 118, 157, 165 P.2d 389 (1946); *State* v. *Roberts,* 86 N.J. Super. 159, 166, 206 A.2d 200 (1965); *Makley* v. *State,* 49 Ohio App. 359, 364–65, 197 N.E. 339 (1934). Such information or knowledge, however, should be placed on the record outside the presence of the jury and the defendant given the opportunity to respond to that information. See *State* v. *Roberts,* supra.

On June 8, 1983, the record was augmented by the statements of the court and the state as to the defendant's prior record and the skirting around both counsel tables. Defense counsel did not question the defendant's prior criminal record, including the fact that the earlier escape had taken place in the same courthouse. He did not object to the nature or placement of the skirting material. In addition, he raised no issue concerning the court's reiteration that if the jury became aware of the shackles it would be because of the defendant's conduct. There is no evidence that the jury ever saw the shackles nor is there anything in the record that shows that the shackles inhibited the defendant's ability to interact with his attorney. See *Corley* v. *Cardwell,* 544 F.2d 349 (9th Cir.), cert. denied, 429 U.S. 1048, 97 S. Ct. 757, 50 L. Ed. 2d 763 (1976); *State* v. *Mills,* 94 N.M. 17, 606 P.2d 1111 (N.M. App.), cert. denied, 94 N.M. 628, 614 P.2d 545 (1980). The appellant has not car-

ried his burden of providing an appellate record which supports his claim of error. See *State* v. *One 1977 Buick Automobile,* 196 Conn. 471, 480, 493 A.2d 874 (1985); *DeMilo* v. *West Haven,* 189 Conn. 671, 681, 458 A.2d 362 (1983).[5] There is simply no showing that the jury was prejudicially affected by the court's action on the shackles. Cf. *Estelle* v. *Williams,* supra; *State* v. *Moen,* supra. While shackling is a serious sanction, the trial court placed sufficient information on the record to warrant it and took great pains to make it as inconspicuous as possible. Without repeating the reasonable accommodation to be made between the interests involved where shackles are used when reasonably necessary, as here, we cannot say that the trial court abused its discretion under all the circumstances.

We also find no abuse of discretion in the trial court's ruling concerning the presence of state troopers in the courtroom. Only recently, the United States Supreme Court, with Justice Marshall writing for a unanimous court, said that "the conspicuous, or least noticeable, deployment of security personnel in a courtroom during trial is [not] the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial." *Holbrook* v. *Flynn,* 475 U.S. 560, 568–69, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986). Positing that "reason, principle and common human experience" counsel against a presumption that "any use of identifiable security guards in the courtroom is inherently prejudicial," *Holbrook* found no denial of a fair trial where

---

[5] It has even been said that "[a]n appellate court will not find error on the ground that the defendant was shackled unless it is shown that the jury saw the shackles." *State* v. *McMurtrey,* 136 Ariz. 93, 98, 664 P.2d 637 (1983), citing *State* v. *Clark,* 340 So. 2d 208, 214 (La. 1976), cert. denied, 430 U.S. 936, 97 S. Ct. 1563, 51 L. Ed. 2d 782 (1977); *State* v. *Beal,* 470 S.W.2d 509, 516 (Mo. 1971); *State* v. *Johnston,* 98 N.M. 92, 97, 645 P.2d 448 (1982); cf. *Scott* v. *State,* 88 Nev. 682, 504 P.2d 10 (1972); *Davis* v. *State,* 505 S.W.2d 800 (Tex. Crim. App. 1974).

the defendant objected to the presence of four uniformed and armed Rhode Island state troopers in the first row of the spectators section during the trial.[6] Id. Recognizing the "varieties of ways" in which courtroom security guards "can be deployed," *Holbrook* v. *Flynn* laid down a case-by-case approach.

While the state appears to concede that there was one state trooper in the courtroom, the record indicates nothing concerning his attire, whether he was visibly armed or his deployment at trial. Further, the record contains no mention of any other troopers being present at trial. The record provided to us by the defendant is, therefore, simply inadequate to support this claim. See *State* v. *One 1977 Buick Automobile,* supra; *DeMilo* v. *West Haven,* supra.

In sum, we find no abuse of discretion by the trial court. There was a reasonable necessity for the measures taken. Under the circumstances, the defendant was not deprived of a fair trial before an impartial jury. We, therefore, find no merit in his claims.

## II

The defendant's next claim is that the trial judge's preliminary jury instruction, which was given immediately after the state's first witness, the shooting victim, had been sworn, violated his federal and state constitutional rights to a fair trial before an impartial jury. He asserts that the preinstruction[7] was given

---

[6] In addition to the four state troopers, the courtroom security force in *Holbrook* v. *Flynn,* 475 U.S. 560, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986), also included two deputy sheriffs and six Committing Squad officers.

[7] We employ the term "preinstruction" for convenience to conform with the reference thereto in the briefs and oral argument. There is nothing talismanic in our use of that term here. The preinstructions were the following, before Fitzgerald testified;

"The Court: Ladies and gentlemen, I think it is appropriate that I bring the statutes that you are going to be concerned with to your attention as a matter of preliminary information.

without notice, at a highly prejudicial time of the trial. It was also error, he claims, because the court failed

"This is not intended to be a preliminary charge, nor is it intended to be any kind of a detailed charge.

"I am merely going to point out to you the statutes that the charges suggest will be before you, for your consideration, so that when you do hear something with respect to what the statutes actually read, you will have some recognition of it.

"First, the definition of 'murder.' Our law says that a person commits murder when, with the intent, and, obviously, 'with intent' is a mental state, it is something that is done deliberately, something done on purpose. It is not inadvertent or by accident, so it is deliberate.

"Mr. Dimyan [defense attorney]: Your Honor, I would wish to make a motion to the Court, and I ask that the Jury be excused.

"The Court: Is it something to do with this?

"Mr. Dimyan: Yes, Your Honor. I feel it is not appropriate at this time.

"The Court: Excuse the Jury, please.

(Whereupon, the Jury is escorted from the courtroom.)

"Mr. Dimyan: Your Honor, I would argue that the Court's instructing and reading the statute to the Jury at this time is, in essence, giving the charge to the Jury before all the evidence.

"The Court: Let's assume you are correct. Cite me a case or statute that says it is inappropriate or wrong.

"Mr. Dimyan: Your Honor, I am arguing it has a prejudicial effect.

"The Court: Cite me a case.

"Mr. Dimyan: I don't have any.

"The Court: Any jurisdiction from any statute?

"Mr. Dimyan: I don't have any.

"The Court. No, you don't. I will hear your argument, understanding that there is no basis for it.

"Mr. Dimyan: That is my argument.

"The Court: Anything further?

"Mr. Dimyan: No.

"The Court: Mr. Arconti?

"Mr. Arconti [state's attorney]: No.

"The Court: Denied.

"Mr. Dimyan: Exception.

(Whereupon, the Jury is escorted back into the courtroom.)

\* \* \*

"The Court: I indicated to you, ladies and gentlemen, that a person commits murder when, with the intent to cause death of another person, he causes the death of such person.

"There is more to the statute than that. This is a very basic definition that's included, and it is all I intend to discuss with you at this point.

"I mentioned what 'intent' is, and I indicated to you it is a deliberate, purposeful action as opposed to an inadvertent, accidental action.

to advise the jury at that time about basic constitutional principles that guaranty him the presumption of inno-

"Now, in this case, of course, is the charge of criminal attempt to commit murder, and a 'criminal attempt' occurs this way. These are all statutory definitions, ladies and gentlemen.

"A person commits an attempt to commit a crime if, acting with the kind of mental state required for the commission of the crime, he intentionally engages in conduct which would constitute the crime, if attendant circumstances were as he believed them to be, or two, he intentionally does or [omits] to do anything which, under the circumstances as he believes them to be, is an act or omission constituting in a substantial step in a course of conduct planned to culminate in his commission of the crime.

"So, again, the attempt statute requires what might be said to be an action done deliberately, purposefully, to commit a crime which does not result in the fulfilled act, in and of itself, to fully commit a crime.

"It requires a mental state, as I mentioned to you. I told you what intent was briefly, and I will tell you much more about both of these at the end of the case.

"The second statute with which you should be concerned is the charge of assault on a Peace Officer. A person commits an assault on a Peace Officer when, with intent to prevent a reasonably identifiable Peace Officer, as defined in the section of the statute, in performing his duty, he causes physical injury to such Peace Officer, and there are other sections that are involved as well. If they become applicable, I will bring them to your attention.

"Obviously, again, we are talking about something that requires a specific intent as opposed to something accidental or inadvertent.

"It requires that the person who fills the role of a Peace Officer be reasonably identifiable to the person who commits the act.

"Of course, it requires an infliction of injury upon that Officer.

"The charge of the sale of a narcotic substance is very, very simple in concept. First of all, a sale is an exchange of goods in return for a consideration. That's a very basic definition of it, and for this time, for our purposes, everyone on this Jury, I am sure, knows exactly what a sale is. It is the exchange of goods or that commodity for some kind [of] consideration, generally money.

"This, again, has to be done knowingly and intentionally. If, for example, someone of you were passed a pack of cigarettes to another and charged the person the ordinary price for a pack of cigarettes, believing that the fact that he was delivering cigarettes when in fact there was narcotic substance in that particular container which was not known, obviously, the knowledge, the intent to violate the statute would not be present. So, it has to be something done knowingly, and it has to be done deliberately.

"With respect to the question of whether or not the substance which is sold is a narcotic, that is very, very easy for you to determine in that the

cence until such time during its deliberations and after proper instructions the jury concluded that the state had sustained its burden of proof. He also maintains that the instructions given during this innovative[8] procedure were thus incomplete and undermined the jury's role as an impartial factfinder. We are not persuaded by the defendant's arguments on this claim.

"A fair trial is implicit in the term 'due process of law.' 'The requirements of due process are met in the trial of a person accused of crime if he has been given the benefit of a fair and impartial trial in accordance with the settled course of judicial proceedings in this state.' *Wojculewicz* v. *Cummings,* 145 Conn. 11, 19, 138 A.2d 512, cert. denied, 356 U.S. 969, 78 S. Ct. 1010, 2 L. Ed. 2d 1075 (1958)." *State* v. *Asherman,* 193 Conn. 695, 724, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985); see *State* v. *Harden,* 175 Conn. 315, 326, 398 A.2d 1169 (1978). This rubric of due process also postulates that the trial

statutes, the laws, the Legislature has enacted, provided very clearly certain substances designed as 'narcotic substances.'

"Of course, during the course of the trial, you find that one of the substances has, in fact, been proven, beyond a reasonable doubt, to have been sold, then the Legislature—and, of course, knowingly and intelligently, then the Legislative definition of that substance would cause you to determine whether or not it was a narcotic.

"If you believe it to be a specific substance, and if the statute classifies that substance as a narcotic, then the narcotic aspect of the sale of a narcotic substance would be satisfied.

"As I told you, the charge will be much more detailed at the end of the case. That's very basically what the statutes require and what they preclude.

"Proceed."

[8] At the time of trial, Practice Book § 854 provided in part: "The judicial authority shall deliver the instructions to the jury after the closing arguments."

We have never used this rule to prohibit any preinstruction to the jury. See *Jerrold Electronics Corporation* v. *Wescoast Broadcasting Co.,* 341 F.2d 653, 665 (9th Cir.), cert. denied, 382 U.S. 817, 86 S. Ct. 42, 15 L. Ed. 2d 64 (1965) (trial court's conduct in advising jury at outset of trial of the nature of the case and anticipated issues was not prejudicial to defendants as violation of rule that jury should be instructed after argument).

be before an impartial judge and an unprejudiced jury. See *State* v. *Fernandez,* 198 Conn. 1, 10, 501 A.2d 1195 (1985); *State* v. *Echols,* 170 Conn. 11, 13, 364 A.2d 225 (1975). The judge is not an umpire in a forensic encounter; he is a minister of justice and may, of course, take all steps reasonably necessary for the orderly progress of the trial. *Felix* v. *Hall-Brooke Sanitarium,* 140 Conn. 496, 501–502, 101 A.2d 500 (1953); see *Quercia* v. *United States,* 289 U.S. 466, 469, 53 S. Ct. 698, 77 L. Ed. 1321 (1933).

We believe that a judge sitting with a jury on a criminal case may, in the exercise of a sound discretion, under proper circumstances, preinstruct the jury. "In [*People* v. *Yut Wai Tom,* 53 N.Y.2d 44, 56, 422 N.E.2d 556, 439 N.Y.S.2d 896 (1981)], the New York Court of Appeals appropriately pointed out: 'As defined in subdivision (a) of standard 6-1.1 of the American Bar Association Standards Relating to the Administration of Criminal Justice (Special Functions of. the Trial Judge [1978]): "The trial judge has the responsibility for safeguarding both the rights of the accused and the interests of the public in the administration of criminal justice. The adversary nature of the proceedings does not relieve the trial judge of the obligation of raising on his or her initiative, at all appropriate times and in an appropriate manner, matters which may significantly promote a just determination of the trial." . . .' " *State* v. *Fernandez,* supra, 11. The case of *United States* v. *Bynum,* 566 F.2d 914 (5th Cir.), cert. denied sub nom. *Becker* v. *United States,* 439 U.S. 840, 99 S. Ct. 129, 58 L. Ed. 2d 138 (1978), is instructive. In *Bynum,* the Fifth Circuit Court of Appeals, noting that it had found no prior Fifth Circuit case on "preliminary instructions," said that despite this it "certainly is the obligation of the [district] court to do all within its power to assist the jury in understanding the issues involved

and the application of the law. Such preliminary instructions seem very appropriate in just such a case." Id., 924 n.7.

While the court's charge instructing the jury on the law that it should apply to the facts as they are found is given after all the evidence is in and arguments had, "instructions" are given to the jury frequently during the trial be they limiting, cautionary, explanatory or the like. Such instructions, however, do not supersede those given after evidence and arguments under our practice. See *People* v. *Newman,* 46 N.Y.2d 126, 130, 385 N.E.2d 598, 412 N.Y.S.2d 860 (1978). We agree in principle with Professor Moore when he said: " '[I]nstructions of importance delivered during the trial would necessarily be repeated in the court's charge.' " *United States* v. *Ruppel,* 666 F.2d 261, 274 (5th Cir. 1982), quoting 8A J. Moore, Federal Practice (2d Ed. 1981) § 30.02, p. 30–5. "Although the federal case law discussing the propriety of also instructing the jury at the outset of the trial is sparse, those decisions that have addressed the matter have found 'preinstruction' to be a commendable practice so long as the jury is again fully instructed at the close of the proceedings. *United States* v. *Ruppel,* supra; *Jerrold Electronics Corporation* v. *Wescoast Broadcasting Co.,* 341 F.2d 653 (9th Cir.), cert. denied, 382 U.S. 817 [86 S. Ct. 42, 15 L. Ed. 2d 64] (1965)."[9] Report of the Committee on Juries of the Judicial Council of the Second Circuit (August 1984) p. 40; see Prettyman, "Jury Instructions—First or Last?" 46 A.B.A. J. 1066 (1960); Winslow, "The Instruction Ritual," 13 Hastings L.J. 456, 470–71 (1961–62).

---

[9] "Rule 51 of the Federal Rules of Civil Procedure and Rule 30 of the Federal Rules of Criminal Procedure both provide that the judge must instruct the jury at the close of the evidence and after counsel's closing arguments." Report of the Committee on Juries of the Judicial Council of the Second Circuit (August 1984) p. 40.

In *People* v. *Newman,* supra, 129–30, Justice Fuchsberg, speaking for the New York Court of Appeals, said: "It is well and good for Trial Judges to give jurors the benefit of an introductory and explanatory address to help dissipate some of the mystery that may lurk in laypersons who are about to undertake the responsibilities of playing a significant and determinative, albeit transient, role in the adjudicative process. . . . The desirability of orientation, however, does not excuse the requirement for the eventual *predeliberation* instructions which would ordinarily be included in a charge in a particular case. To believe that the first is a substitute for the second, or to act as if it does not matter when but only that a charge is given, is to misapprehend the function of the latter." (Emphasis added.)

The defendant does not and cannot argue that preinstructions are explicitly proscribed by our rules of practice. He does, however, take exception to the timing, content, and effect of the preinstructions given here. In starting our analysis, we must say that we do not consider it prudential for the trial court to have given the instructions involved immediately after the state's first witness, the victim of the shooting, had been sworn in as a witness rather than before that time. We say this despite the fact that the witness had not yet testified at all. In any event, the jury had not yet heard any evidence in the case. On this record, we cannot conclude that the time at which the preinstructions were given, either alone or with all the circumstances, caused the prejudice the defendant claims.

Despite the protestations of the defendant to the contrary, the instructions did not undermine the jury's role as an impartial factfinder. The court was careful to say that it was bringing to the jury's attention "as a matter of preliminary information" the statutes with which "you are going to be concerned." The jury was told that it was "not intended to be a preliminary charge, nor

[was] it intended to be any kind of a detailed charge." The tentative nature of these instructions was further underscored when the court said: "I am merely going to point out to you the statutes that the charges suggest will be before you, for your consideration, so that when you do hear something with respect to what the statutes actually read, you will have some recognition of it." At the end of these instructions, the court reminded the jury that the charge would be much more detailed at the end of the case. The jury, in the absence of a fair indication to the contrary, and there is none here, is presumed to have followed the court's instructions. See, e.g., *State* v. *Glenn,* 194 Conn. 483, 497, 481 A.2d 741 (1984).

The defendant, referring to *State* v. *Washington,* 182 Conn. 419, 438 A.2d 1144 (1980), suggests the potential of ill-considered preinstructions for jeopardizing the fulfillment of the jury's role as impartial factfinder *after* it hears all the evidence and the court's final instruction. This is a serious concern, but one that we conclude was not, on this record, present here. In *Washington,* the trial court, early in the trial, expressly instructed the jurors that they were permitted to discuss the evidence in the jury room prior to the termination of the case. In permitting jurors to discuss the case, we said that "the trial court authorized and encouraged them to give premature consideration to the evidence presented—consideration unaided by the final instructions of the trial court as to the law to be applied to the facts in the case." *State* v. *Washington,* supra, 426. In *Washington,* "[t]he trial court's instruction in effect invited the jurors to begin their deliberations before the close of the case." Id., 428. That was not at all the situation in this case. Not only did the trial court specifically say that the "preliminary information" it was giving the jurors "was not intended to be a preliminary" or "any kind of a detailed charge," but, in this

case, unlike *Washington,* the court explicitly and repeatedly instructed the jurors throughout the trial that they were not to discuss the case among themselves or with anyone on the jury and that they could discuss or deliberate only after they had heard all of the evidence and the court's final instructions. These instructions were given in substance just before every luncheon recess and on adjournment at the end of each day; they were given at least seven times during the trial.[10] After the parties had rested and just before the luncheon recess on that occasion, the court again admonished the jury, saying in part: "Again, while you are at lunch, ladies and gentlemen, you are forbidden to discuss the case amongst yourselves or with anyone else, obviously. You have not heard the Court's instructions, so you are not free to deliberate." These constant, strong and unmistakable instructions to the jurors directed them not to deliberate until all the evidence was in and they had heard the court's charge.

That these instructions were clear does not dispose of the defendant's claim that they were not complete. The defendant argues that the preinstructions should

---

[10] These instructions, besides admonishing against reading or viewing media information about the trial, also frequently direct against any discussion at all. In *State* v. *Washington,* 182 Conn. 419, 428, 438 A.2d 1144 (1980), we pointed out that "[d]iscussion is an integral part of deliberations."

A typical example of the court's instructions here is the following:

"Again, I am going to tell you—you are probably tired of hearing it, but I will tell you anyway. You are forbidden to discuss the case amongst yourselves or with anyone else until you hear all the evidence and the Court's instructions.

"When you do get to deliberate, you are limited to evidence you hear in the courtroom and only that evidence. You are forbidden to acquire any independent knowledge of the facts or circumstances of the parties of this or any other case upon which you might sit.

"If something is printed in the local media, displayed on local television or on a broadcast on a local radio station, you are forbidden to listen to it, read it or look at it, as the case may be.

"Obviously, you are forbidden to be drawn into any conversations on the subject matter relating to this case or anything that may be displayed about it."

have included statements concerning the presumption of innocence, the state's burden of proof, the weighing of credibility and the distinct roles of the judge, jury and counsel. Under the circumstances, even though this was not done, it was not reversible error. The defendant has failed to show that he was prejudiced because of the preinstructions given. See *Jerrold Electronics Corporation* v. *Wescoast Broadcasting Co.,* supra, 665; *State* v. *Parrish,* 73 N.C. App. 662, 327 S.E.2d 613 (1985); see also *United States* v. *Ruppel,* supra. While we are mindful that the preinstructions were given without notice, defense counsel merely excepted and argued that they had "a prejudicial effect"; he made no motion or suggestion that they be more complete. Immediately before the challenged preinstructions were given, the court, in addressing the two alternates as to their function, referred to its jury indoctrination on the prior day.[11] Significantly, the court's final instructions to the jury fully covered all the applicable legal principles. The defendant took only one exception to the final instructions which is not pertinent here. The jury was fully and properly instructed at the critical time, after all the evidence and after the arguments of counsel. The preinstructions did not violate the defendant's federal or state constitutional rights. Under the circumstances of this case, there was no abuse of discretion by the trial court.

While the concurrence of circumstances in this case demonstrates no abuse of discretion on the preinstruction issue, we caution trial judges to consider carefully the timing, content and completeness of such preinstructions. Caution, care and receptivity to input by counsel should also be on the agenda. While on occasion preinstructions may be necessary; see, e.g., *United States* v. *Bynum,* supra; and trial judges should not

---

[11] During its remarks to the alternate jurors, the court referred to its jury indoctrination of the prior day on three occasions.

shrink from acting, in the main we concur with Justice Fuchsberg when he said: "[T]he issue crystallization process can only achieve its potential if detailed instructions are given immediately before the jury's deliberation. Introductory remarks are no substitute." *People* v. *Newman,* supra, 130. We take this opportunity to indicate to the trial courts that preinstructions require certain procedural safeguards. These safeguards include advance notice to the parties of the court's intention to give preinstructions and a reference, at least by incorporation of earlier indoctrination instructions, to the defendant's presumption of innocence and the state's burden of proof.

## III

Finally, the defendant claims error in the jury instruction that he could be found guilty of the crime of assault upon a peace officer in violation of General Statutes § 53a-167c (a) (1)[12] "in disregard of what the court called 'the literal meaning of the statute' [§ 53a-167c (a) (1)] which requires that the defendant intend to prevent a *reasonably identifiable* peace officer from performing his duty."[13] We do not agree.

It is uncontested that police officer Fitzgerald appeared to the defendant in his clothing and conduct to be a person who blended appropriately into the milieu of those associated with narcotics in the Danbury area.

[12] General Statutes § 53a-167c (a) (1) provides in part: "A person is guilty of assault of a peace officer . . . when, with intent to prevent a reasonably identifiable peace officer . . . from performing his duty, (1) he causes physical injury to such peace officer . . . ."

[13] The defendant did not except to this instruction and he now asks us to review his claim based on *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1972), and as "plain error." We review this claim under *Evans,* not only because the record is adequate to do so but because his claim is that the evidence was insufficient to justify the submission of this crime to the jury at all. Involving, as it does, his claim concerning the "reasonably identifiable" peace officer element of the statute, we address this claim. See *In re Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).

He was a police officer working undercover seeking essentially to make narcotics buys. There was no evidence that the defendant had ever seen him in a police uniform, display his badge, or wear any indicia of a peace officer. There was, however, evidence that on the very day of the assault the defendant had learned that Fitzgerald was a police officer. The defendant had been told by Jackson that Fitzgerald was a "narc."[14] Robinson heard the defendant say, "I am going to ice that narc." Moreover, Robinson also testified that he believed those words meant that the defendant would "shoot [Fitzgerald]."

Against this background, the defendant focuses on the court's statement to the jury that "the literal meaning of the statute [was] not satisfied" because Fitzgerald's appearance was the "antithesis of what a readily identifiable or reasonably identifiable or recognizable peace officer is . . . ." The defendant argues that the "reasonably identifiable" element of the statute requires that an objective standard be applied. The defendant maintains that instead of following the statute's express requirement in that regard, the court read into the statute a subjective standard, an actual knowledge element. The defendant refers to the language in the charge which said: "However, there is evidence in the case that Officer Fitzgerald was, indeed, reasonably identifiable, that he was recognized and known to be a peace officer; that that recognition of his identity was disclosed to Mr. Woolcock, that he acknowledged the disclosure of it and told someone that he was going to 'ice the narc.' " Leaving the credibility of that evidence squarely up to the jury, the court further instructed that if it found that evidence to be true, "then you can

---

[14] A "narc" has been defined as "a member of federal or local law enforcement agencies dealing with the illegal use and distribution of narcotics." J. David, "The Jonathan David Dictionary of Popular Slang" (1980) p. 105; see *State* v. *Scielzo,* 190 Conn. 191, 198 n.11, 460 A.2d 951 (1983).

find the identification aspect of this statute to be satisfied, even though the literal wording itself is different from the ordinary context in which you might encounter this particular statute."

The defendant, while conceding that the court's construction of the statute might be desirable on policy grounds, argues that this construction was, nevertheless, "an extraordinary extension of the statutory ambit, unjustifiable because criminal statutes are to be strictly construed in favor of the defendant's liberty interest." Maintaining that the statutory purpose was to protect officers "manifestly acting in their official capacity," he asserts that the court instructed the jury "on a theory of culpability tailored to fit the evidence heard, but deviating from the plain meaning of the 'reasonably identifiable' element . . . [as] defined by the legislature." We find no error in the instruction.

It is fundamental that guilt in a criminal case must be proved beyond a reasonable doubt on each essential element of the crime charged. *In re Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State* v. *Utz,* 201 Conn. 190, 197, 513 A.2d 1191 (1986). Under § 53a-167c (a) (1) the state must prove that the victim of the defendant's assault is a "reasonably identifiable" peace officer. " 'It is axiomatic that "penal statutes . . . are to be strictly construed to protect the fundamental constitutional right to liberty." ' . . . Equally fundamental, however, is the 'principle of statutory construction that statutes are to be construed so that they carry out the intent of the legislature.' " (Citations omitted.) *State* v. *Belton,* 190 Conn. 496, 505, 461 A.2d 973 (1983). *State* v. *Pastet,* 169 Conn. 13, 21–22, 363 A.2d 41, cert. denied, 423 U.S. 937, 96 S. Ct. 297, 46 L. Ed. 2d 270 (1975), aptly observes: "Although the principle is well established that penal satutes must be strictly construed, the application of common sense to the language of a penal law is not to be excluded in a

way which would involve absurdity or frustrate the evident design of the lawgiver." See *State* v. *Shockley,* 188 Conn. 697, 711, 453 A.2d 441 (1982); *State* v. *Sober,* 166 Conn. 81, 91, 347 A.2d 61 (1974); *State* v. *Archambault,* 146 Conn. 605, 607–608, 153 A.2d 451 (1959); *State* v. *Bello,* 133 Conn. 600, 604, 53 A.2d 381 (1947); see also 3 Sutherland, Statutory Construction (4th Ed. Sands) § 59.06.

The statute plainly intends that the conduct which it prohibits be judged from the vantage point of the criminal actor. In other words, was the person the actor is charged with assaulting "reasonably identifiable" as a peace officer to the actor? The standard is, as the defendant claims, objective but it is also subjective. Not to predicate criminal liability on the "reasonably identifiable" element on the knowledge of the actor defies not only common sense but also frustrates the statutory purpose of proscribing assaults on "reasonably identifiable" peace officers. The statute is intended to protect peace officers in the performance of their duty. It not only protects peace officers, who to the eye and ear of the person involved present themselves with the garb and indicia of their status as peace officers, but also peace officers whom the actor either knows in fact or should reasonably know to be peace officers. It would be a bizarre conclusion, thwarting the legislative intent, to say that an assault upon a peace officer whom the actor actually knew was a peace officer was not an assault on a "reasonably identifiable" peace officer simply because the officer did not physically appear and conduct himself as a police officer.

Contrary to the defendant's claim, the jury instruction did not expand the ambit of this statute. The trial court's instruction first made it clear to the jury that a peace officer is reasonably identifiable "if he appears in a police uniform, the ordinary clothing that a police officer wears, including the equipment he wears with

it, the accoutrements that go with it, and the badge," as well as also telling the jury "[the statute] may also apply to a man in civilian clothes . . . such as, at the scene of an accident, who is displaying a badge . . . and you see the badge . . . ." After so stating, the court did go on to say that in this case, "the literal meaning of the statute is not satisfied" because Fitzgerald was not in uniform and displayed no badge but was working undercover. Nevertheless, the court then instructed that, based on the evidence of the defendant's actual knowledge that Fitzgerald was a "narc" and that he had earlier that evening said that he was going to "ice the narc," the "reasonably identifiable" element would be satisfied if it credited that evidence. Construing this instruction as a whole, rather than isolating the "literal meaning" allusion, we find no error.

There is no error.

In this opinion the other justices concurred.