******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* LAMAR MCCARTHY
## (AC 43785)

Bright, C. J., and Prescott and Vertefeuille, Js.

*Syllabus*

Convicted of three counts of kidnapping in the second degree and one count each of conspiracy to commit robbery in the second degree and larceny in the second degree, the defendant appealed to this court. The defendant drove R, an individual who sought to purchase heroin from him and who owed him money, to a bank. Unbeknownst to the defendant, who had remained in his vehicle during the incident, R robbed the bank. Although the defendant was unaware of R's wrongdoing, as he drove away from the scene, he noticed a police cruiser following him and began to drive very erratically and at high speeds. After his motor vehicle became disabled, the defendant stopped in front of a gas station. The defendant and R exited the vehicle, ran toward a Jeep that was parked at a gas pump, and demanded that W, the driver of the Jeep, get out of the vehicle. When W responded that his family was inside, the defendant ran to the passenger side of the vehicle, climbed over M, W's wife, and got into the driver's seat. R attempted to enter the backseat of the Jeep but was unsuccessful, as M and W's grandchildren were strapped into booster seats in the backseat. The defendant promptly exited the gas station at a high rate of speed with M and her grandchildren still inside the vehicle. The defendant took M's cell phone from her and entered the highway, continuing to drive erratically and at a high rate of speed. Approximately ten minutes after gaining control of the Jeep, the defendant pulled over to the side of the highway to let M and her grandchildren exit the vehicle. The defendant then immediately drove away, without returning M's cell phone, and M had to flag down a passerby for assistance. The defendant was not charged with any crimes relating to the robbery of the bank, rather, the charges against him stemmed solely from his taking of the Jeep. *Held*:

1. The defendant could not prevail on his claim that he was entitled to a new trial on the kidnapping charges because the trial court improperly failed to provide an incidental restraint instruction to the jury in accordance with *State* v. *Salamon* (287 Conn. 509), the state having persuaded this court beyond a reasonable doubt that the error was harmless: the trial court's failure to instruct the jury on an essential element of the offense was a constitutional error, requiring the state to prove that the failure was harmless beyond a reasonable doubt; moreover, when evaluated in accordance with the relevant factors set forth in *Salamon*, there was no reasonable possibility that a properly instructed jury would have reached a different result concerning whether the defendant's restraint of M and her grandchildren was incidental to or necessary for him to complete the larceny, as, even though the defendant took possession of the Jeep at approximately the same time that he first restrained the victims and he restrained them only for approximately ten minutes, the defendant could have completed the larceny and released the victims earlier, he transported the victims to multiple locations while they were confined to the Jeep, the fact that the defendant was more likely to be apprehended by the police at the gas station if he permitted the victims to immediately exit the Jeep did not compel a conclusion that the victims' restraint was incidental to or necessary for the commission of the larceny, the defendant's restraint of the victims in a fast-moving vehicle while withholding M's cell phone from her, prevented the victims from summoning assistance or alerting the police to his location, the defendant's risk of detection was reduced and he was able to flee the gas station unhindered because he did not stop to free the victims at or near the scene of the larceny, and the restraint increased the victims' risk of harm independent of that posed by the larceny because the defendant confined them to a moving car that he was operating in an erratic manner and at high speeds and then left them on the side of the highway, he refused to return M's cell phone before he drove away, and he inspired fear in his victims.

2. Contrary to the defendant's claim, there was sufficient evidence from which the jury reasonably could have found the defendant guilty beyond a reasonable doubt of each of the three counts of kidnapping in the second degree: because, with respect to the defendant's first claim, this court concluded that there was no reasonable possibility that a properly instructed jury would find that the defendant's restraint was incidental to or necessary for his completion of the larceny, it necessarily followed that a reasonable view of the evidence supported the jury's finding that the defendant intended to prevent the victims' liberation beyond that which was incidental to or necessary to complete the larceny and, consequently, supported the jury's verdict; moreover, the evidence admitted at trial, including testimony regarding the defendant's erratic driving at high speeds and M's concern for her safety and for that of her grandchildren, and the reasonable inferences that the jury was permitted to draw therefrom, were more than sufficient to establish that the defendant used or threatened to use force or intimidation to restrain the victims from exiting the vehicle before he began driving and while the vehicle was in motion.

3. The defendant could not prevail on his claim that the trial court abused its discretion and violated his constitutional right to due process when it denied his requests to have his leg shackles removed during trial: although the defendant expressed concern at trial that one of the jurors may have seen his leg shackles, the trial court had instructed a judicial marshal to sit in various chairs in the jury box to confirm that the defendant's leg shackles were not visible to the jury and the record revealed no evidence to suggest that the jurors actually saw or otherwise knew of the defendant's leg shackles; accordingly, the defendant failed to satisfy his burden of demonstrating that the jurors actually saw or otherwise was aware of his restraints and, therefore, failed to establish that the trial court's denial of his requests to remove his restraints deprived him of his right to a fair trial.

Argued September 15, 2021—officially released January 18, 2022

### Procedural History

Substitute information charging the defendant with three counts of the crime of kidnapping in the second degree and with one count each of the crimes of robbery in the second degree, conspiracy to commit robbery in the second degree, and larceny in the second degree, brought to the Superior Court in the judicial district of New Britain, geographical area number seventeen, and tried to the jury before *D'Addabbo, J.*; verdict and judgment of guilty of three counts of kidnapping in the second degree and one count each of conspiracy to commit robbery in the second degree and larceny in the second degree, from which the defendant appealed to this court. *Affirmed.*

*Alice Osedach*, assistant public defender, for the appellant (defendant).

*Jonathan M. Sousa*, deputy assistant state's attorney, with whom, on the brief, were *Brian W. Preleski*, state's attorney, and *Christian Watson*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, Lamar McCarthy, appeals from the judgment of conviction, rendered following a jury trial, of one count of conspiracy to commit robbery in the second degree in violation of General Statutes §§ 53a-48 and 53a-135 (a) (1) (A), one count of larceny in the second degree in violation of General Statutes § 53a-123 (a) (1), and three counts of kidnapping in the second degree in violation of General Statutes § 53a-94. The defendant claims that (1) the trial court improperly failed to instruct the jury in accordance with *State* v. *Salamon*, 287 Conn. 509, 550, 949 A.2d 1092 (2008); (2) there was insufficient evidence to prove beyond a reasonable doubt that he intended to prevent the liberation of the victims beyond that which was incidental and necessary to commit the larceny and that he used or threatened to use physical force or intimidation to restrain the victims; and (3) the court violated his constitutional right to due process by denying his requests to remove his leg shackles. We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to this appeal. On June 18, 2017, the defendant received a phone call from Norman Renaldi, who sought to purchase heroin from the defendant and asked him for a ride from Newington to Hartford. Renaldi previously had purchased heroin from the defendant on several occasions. The defendant picked up Renaldi in a red Honda minivan and told Renaldi that he owed the defendant money. Renaldi instructed the defendant to drive to the Stop & Shop at 505 North Main Street in Southington, inside of which was a People's United Bank branch (bank). During the drive and unbeknownst to the defendant, Renaldi wrote a note on the back of a coupon, which stated, "EMPTY BOTH CASH DRAWERS QUICKLY + QUI[E]TLY AND NO-ONE GETS HURT!!"

After the defendant and Renaldi arrived at Stop & Shop, the defendant remained in the minivan while Renaldi went inside. Renaldi approached the bank and handed the note to one of the bank tellers. He kept one of his hands in the pocket of his sweatshirt, suggesting to the teller that he had a weapon. The teller retrieved and handed to Renaldi a large quantity of cash, which Renaldi placed, along with the note, into a slit that he had cut into the lining of his sweatshirt. Renaldi then exited the Stop & Shop, got back into the minivan, and told the defendant that they could leave. He did not tell the defendant that he had robbed the bank. Meanwhile, one of the bank tellers activated an alarm, which alerted the police that a robbery had occurred at the bank.

At approximately 1:15 p.m., on duty police officers received a dispatch that a white male had entered the

bank, demanded cash, implied that he possessed a weapon, and then fled the scene in a red minivan. When the dispatch was received, the defendant was driving the minivan northbound on Route 10 in Southington. Southington Police Officer Jeremey Busa, who was on patrol, observed a red minivan that matched the description from the dispatch driving on Route 10. When the minivan stopped at a red traffic light, Busa pulled behind it in his police cruiser. The defendant noticed Busa's cruiser and became nervous. The defendant attempted to maneuver the minivan around a vehicle that was stopped in front of it at the stoplight but proceeded to hit the vehicle. The defendant then executed a U-turn and accelerated southbound down Route 10, at which point Busa activated the lights and siren of his cruiser. The defendant drove at a high rate of speed, striking the curb on the side of the road, weaving in and out of traffic, crossing into incoming traffic, failing to stop at red lights, and driving across the driveways and lawns that abutted Route 10. Southington Police Officer Neal Ayotte, who was also on patrol, responded to the bank robbery dispatch, activated his body camera, and joined in the pursuit of the minivan in his police cruiser. As he approached the minivan on Route 10, Ayotte observed the driver operating the minivan erratically, and, at some point, Ayotte had to pull his cruiser into the front yard of a nearby residence to avoid being hit by the minivan.

Eventually, the tires on the passenger side of the minivan became flat, began to squeal, and emanated sparks and smoke. The defendant told Renaldi that the minivan belonged to his wife and that they needed to obtain another vehicle. Accordingly, the defendant stopped in front of a Shell gas station located at 212 Main Street in Southington (gas station) and parked the minivan so that it straddled the curb and the sidewalk in front of the gas station. Several police officers, including Busa and Ayotte, simultaneously arrived at the gas station. The defendant and Renaldi exited the minivan and ran toward a white Jeep Cherokee that was parked at a gas pump in front of the gas station.

The driver of the Jeep, W, had just finished pumping gas and had begun to get back into his Jeep when the defendant and Renaldi approached him. W's wife, M, was sitting in the front passenger seat of the vehicle, and their grandchildren, L and O, were sitting in booster seats in the backseat. Renaldi grabbed W and instructed him to get out of the Jeep, to which W responded that his family was inside of the vehicle. The defendant ran to the passenger side of the vehicle, climbed over M, and got into the driver's seat. Renaldi unsuccessfully attempted to enter the backseat of the Jeep through the passenger side door. Once the defendant was in the driver's seat, he promptly exited the gas station in the Jeep at a high rate of speed with M, L, and O still inside.

Police officers chased Renaldi, who had exited the parking lot of the gas station on foot and had run onto Route 10. The officers ordered Renaldi to stop running and to get on the ground. Eventually, the officers apprehended Renaldi and recovered his sweatshirt, the stolen cash, which totaled more than $12,000, and the note. Later, Renaldi identified the driver of the Jeep as the defendant.[1]

While at the gas station, Busa observed that the minivan, which was still running, had sustained damage to its front bumper and quarter panel, its rear rim, and its passenger side tires. Busa recovered a wallet on the driver's seat of the minivan. The defendant's license and several other cards with his name on them were located inside of the wallet. Various documents addressed to the defendant, including a letter, a receipt, and an invoice, were also recovered from the minivan.

After exiting the gas station, the defendant drove the Jeep southbound on Route 10 at a high rate of speed. M had to hold onto the dashboard, the handle above the passenger side door, and the inside of the door while he was driving. The defendant asked M about the location of the nearest highway and whether she had a cell phone. M directed the defendant to the entrance of Interstate 84 and, although she initially lied and responded that she did not have a cell phone, eventually gave her cell phone to the defendant for fear that the phone may ring. Throughout the course of the drive, M tried to calm her grandchildren, one of whom was crying, while acknowledging that she "couldn't believe" what was happening. She also told the defendant that she "didn't know" or "care" what he had done, but she "just wanted [her grandchildren] to be safe . . . ." The defendant told M that he "wasn't going to hurt" her and the grandchildren.

The defendant entered Interstate 84 westbound and drove on the highway. Eventually, the defendant pulled the Jeep to the side of the highway and instructed M to quickly exit the vehicle. Although the defendant pulled over on the side of the highway near an exit, he did not exit the highway to release M, L, or O. M exited the Jeep, removed her grandchildren from their booster seats, and shut the door. The defendant immediately drove away without returning M's cell phone to her. M attempted to calm her grandchildren and, shortly thereafter, flagged down a passerby and borrowed his cell phone to call her son. The police subsequently arrived to where the defendant had left them. In total, approximately ten minutes passed between when the defendant gained control of the Jeep at the gas station and when the defendant allowed the victims to exit the vehicle.

On September 25, 2017, the defendant was arrested pursuant to a warrant. Prior to trial, the state filed a

corrected substitute information dated September 12, 2019, charging the defendant with one count of robbery in the second degree in violation of § 53a-135 (a) (1) (A), one count of conspiracy to commit robbery in the second degree in violation of §§ 53a-48 and 53a-135 (a) (1) (A), one count of larceny in the second degree in violation of § 53a-123 (a) (1), and three counts of kidnapping in the second degree in violation of § 53a-94. Following a jury trial, the defendant was found not guilty of robbery in the second degree but was found guilty of all other counts.[2] The defendant was sentenced to a total effective term of twenty-five years of imprisonment. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that he is entitled to a new trial on the kidnapping charges because the court improperly failed to provide to the jury an incidental restraint instruction in accordance with *State* v. *Salamon*, supra, 287 Conn. 550, which would have ensured that the defendant could be convicted of kidnapping *only* if the restraint that formed the basis of the kidnapping charges held criminal significance separate and apart from that incidental to or necessary for the completion of the larceny. See *White* v. *Commissioner of Correction*, 170 Conn. App. 415, 423–24, 154 A.3d 1054 (2017). The state concedes that the court improperly declined to provide a *Salamon* instruction in the present case. The state contends, however, that the court's failure to give a *Salamon* instruction was harmless beyond a reasonable doubt because no reasonable juror could have concluded that the defendant did not intend to prevent the victims' liberation for a longer period of time or to a greater degree than that which was incidental to or necessary to commit the underlying larceny. Stated differently, the state argues that the court's failure to provide to the jury an incidental restraint instruction did not affect the verdict. Because we conclude that the state has persuaded us beyond a reasonable doubt that the court's failure to provide a *Salamon* instruction was harmless, we reject the defendant's claim.

The following additional procedural history is relevant to our resolution of this claim. Throughout the duration of the trial, the court and the parties discussed in chambers whether the court should provide to the jury an incidental restraint instruction in accordance with *Salamon*. The court held a charge conference on September 26, 2019, following the close of evidence and outside of the presence of the jury, in accordance with Practice Book § 42-19. During the charge conference, the defendant requested an incidental restraint instruction. The court informed the parties that, although it preliminarily was inclined not to include such an instruction, it would rule on the defendant's

request the following day.

On September 27, 2019, the court denied the defendant's request, stating in its oral ruling that the defendant's restraint of the victims was not incidental to the larceny or the robbery and that it believed that a defendant is entitled to a *Salamon* instruction only if a defendant was charged with kidnapping and another substantive crime arising out of an assault, such as a sexual assault. The court charged the jury later that day and did not provide to the jury a *Salamon* instruction. Following the jury charge and outside of the presence of the jury, the defendant noted on the record his objection to the court's failure to provide a *Salamon* instruction.

We begin by setting forth the applicable standard of review and the relevant principles of law. "The applicability of *Salamon* and whether the trial court's failure to give a *Salamon* instruction was harmless error are issues of law over which our review is plenary." *Farmer* v. *Commissioner of Correction*, 165 Conn. App. 455, 459, 139 A.3d 767, cert. denied, 323 Conn. 905, 150 A.3d 685 (2016). Further, "the question of whether conduct bears . . . criminal significance as kidnapping [independent from the completion of another substantive offense] is one of law. It is, of course, the function of the jury to find the relevant facts, including, ultimately, whether a crime was committed with the intent necessary to qualify as kidnapping, namely, the specific intent to prevent the victim's liberation and not simply to perpetrate the underlying crime. . . . At the same time, it is beyond cavil that it is the role of the judiciary to interpret the relevant statutes and to define, as a matter of law, what type of conduct constitutes kidnapping according to those statutes. . . . As [our Supreme Court] explained in *Salamon*, a necessary corollary is that it falls to the courts to define the intent element of the crime of kidnapping . . . to delineate the ways in which kidnapping differs from coterminous crimes such as robbery and sexual assault . . . and to specify the factors that are relevant to that analysis . . . in light of our understanding of the legislative history of the kidnapping statutes and the policy objectives that animated their modern revision." (Citations omitted.) *Banks* v. *Commissioner of Correction*, 339 Conn. 1, 34, 259 A.3d 1082 (2021).

In *Salamon*, our Supreme Court "reconsidered [its] long-standing interpretation of our kidnapping statutes, General Statutes §§ 53a-91 through 53a-94a. . . . [T]he defendant [in *Salamon*] had assaulted the victim at a train station late at night . . . and ultimately was charged with kidnapping in the second degree in violation of . . . § 53a-94, unlawful restraint in the first degree, and risk of injury to a child. . . . At trial, [the defendant] requested a jury instruction that, if the jury found that the restraint had been incidental to the

assault, then the jury must [find him not guilty] of the charge of kidnapping. . . . [Consistent with established precedent of our Supreme Court] [t]he trial court declined to give that instruction [and the defendant was convicted of kidnapping in the second degree in addition to the two other crimes]. . . .

"[The Supreme Court] . . . ultimately concluded that [o]ur legislature . . . intended to exclude from the scope of the more serious crime of kidnapping and its accompanying severe penalties those confinements or movements of a victim that are merely incidental to [or] necessary for the commission of another crime against that victim.[3] Stated otherwise, to commit a kidnapping in conjunction with another crime, a defendant must intend to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit the other crime"; (footnote added; internal quotation marks omitted) id., 11–12; or than that which was "merely incidental to that underlying crime." Id., 4.

Our Supreme Court thus explained in *Salamon* that "a defendant may be convicted of both kidnapping and another substantive crime if, at any time prior to, during, or after the commission of that other crime, the victim is moved or confined in a way that had independent criminal significance, that is, the victim was restrained to an extent exceeding that which was [incidental to or] necessary to accomplish or complete the other crime. Whether the movement or confinement of the victim is merely incidental to [or] necessary for another crime will depend on the particular facts and circumstances of each case. Consequently, when the evidence reasonably supports a finding that the restraint was not merely incidental to the commission of some other, separate crime, the ultimate factual determination must be made by the jury. For purposes of making that determination, the jury should be instructed to consider . . . various relevant factors . . . ." (Internal quotation marks omitted.) *State* v. *Hampton*, 293 Conn. 435, 460, 988 A.2d 167 (2009); see also *State* v. *Salamon*, supra, 287 Conn. 542.

Since its decision in *Salamon*, our Supreme Court has reiterated that, "when a criminal defendant is charged with kidnapping in conjunction with another underlying crime . . . the jury must be" provided a *Salamon* instruction. *Banks* v. *Commissioner of Correction*, supra, 339 Conn. 4; see also *State* v. *Fields*, 302 Conn. 236, 247–48, 24 A.3d 1243 (2011). "The failure to charge in accordance with *Salamon* is viewed as an omission of an essential element . . . and thus gives rise to constitutional error"; (internal quotation marks omitted) *White* v. *Commissioner of Correction*, supra, 170 Conn. App. 428; that is subject to harmless error analysis. *Banks* v. *Commissioner of Correction*, supra, 29–30.

In the present case, the defendant was charged with

kidnapping in conjunction with larceny arising from his taking the Jeep with M, L, and O inside. Accordingly, the court was required, as the state concedes, to instruct the jury in accordance with *Salamon* and its progeny. See id., 4; *State* v. *Fields*, supra, 302 Conn. 247. No such instruction, however, was given. Because the court's failure to instruct the jury on an essential element of the offense is constitutional error, the burden shifts to the state to demonstrate that the court's failure to instruct the jury was harmless beyond a reasonable doubt. See *Banks* v. *Commissioner of Correction*, supra, 339 Conn. 15; see also *Hinds* v. *Commissioner of Correction*, 321 Conn. 56, 78, 136 A.3d 596 (2016) ("this standard imposes the burden of persuasion exclusively on the state").

"Under *Neder* [v. *United States*, 527 U.S. 1, 15, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)][4] . . . the state must demonstrate that a trial error [of constitutional magnitude] was harmless beyond a reasonable doubt." (Citation omitted; footnote added.) *Banks* v. *Commissioner of Correction*, supra, 339 Conn. 15; see also *Neder* v. *United States*, supra, 15 (articulating test "for determining whether a *constitutional* error is harmless" (emphasis added)). "[T]he test for determining whether a constitutional [error] is harmless . . . is whether it appears beyond a reasonable doubt that the [error] complained of did not contribute to the verdict obtained." (Internal quotation marks omitted.) *State* v. *Hampton*, supra, 293 Conn. 463. Put differently, we evaluate "whether there is a reasonable possibility that a properly instructed jury would reach a different result." *State* v. *Flores*, 301 Conn. 77, 87, 17 A.3d 1025 (2011).

In the present case, the jury, properly instructed, would have been tasked with determining whether the defendant's restraint of the victims was incidental to or necessary for his completion of the larceny. See *State* v. *Hampton*, supra, 293 Conn. 460. To make this determination, the jury should have been instructed to consider a series of factors laid out by our Supreme Court in *Salamon*, namely, "(1) the nature and duration of the victim's movement or confinement, (2) whether that movement or confinement occurred during the commission of the separate offense, (3) whether the restraint was inherent in the nature of the separate offense, (4) whether the restraint prevented the victim from summoning assistance, (5) whether the restraint reduced the perpetrator's risk of detection, and (6) whether the restraint created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense." *Banks* v. *Commissioner of Correction*, supra, 339 Conn. 42; see also *State* v. *Salamon*, supra, 287 Conn. 548.

On the basis of our review of the record, we conclude that the court's failure to provide an incidental restraint

instruction was harmless because the state has persuaded us that there is no reasonable possibility that the jury, properly instructed, would have reached a different result concerning whether the defendant's restraint of the victims was incidental to or necessary to complete the larceny. In so concluding, we consider the various relevant factors set forth in *Salamon*;[5] see *White* v. *Commissioner of Correction*, supra, 170 Conn. App. 429; and acknowledge that, "[a]lthough the relative importance of the various factors will vary depending on the context, [our Supreme Court] ha[s] made clear that the touchstone in any *Salamon* case, in assessing whether conduct associated with [another substantive offense] has independent criminal significance as a kidnapping, is the intent of the offender." *Banks* v. *Commissioner of Correction*, supra, 339 Conn. 43.

With regard to the first relevant factor, the nature and duration of the victims' movement or confinement, the state argues that the nature of the defendant's confinement of the victims in a moving vehicle and the distance the defendant moved the victims indicates that the restraint was neither incidental to nor necessary for his completion of the larceny. The defendant disagrees, arguing that this factor weighs in his favor because the larceny and the alleged kidnappings commenced at the same time, the defendant did not harm or threaten to harm the victims while he drove them, and the victims were in the vehicle for no more than ten minutes.

"[T]here are no minimum time or distance requirements to establish a restraint" within the context of kidnapping. *State* v. *Winot*, 294 Conn. 753, 767, 988 A.2d 188 (2010). Nonetheless, our Supreme Court, in *Hinds*, "attempted to categorize various *Salamon* incidental restraint cases with differing degrees of confinement or movement"; *White* v. *Commissioner of Correction*, supra, 170 Conn. App. 430; and noted that "an important facet of cases where the trial court has failed to give a *Salamon* instruction and that impropriety on appellate review has been deemed harmless error is that longer periods of restraint or greater degrees of movement demarcate separate offenses. . . . [M]ultiple offenses [like kidnapping and another substantive crime] are more readily distinguishable—and, consequently, more likely to render the absence of a *Salamon* instruction harmless—when the offenses are separated by greater time spans, or by more movement or restriction of movement.

"Conversely, multiple offenses occurring in a much shorter or more compressed time span make the same determination more difficult and, therefore, more likely to necessitate submission to a jury for it to make its factual determinations regarding whether the restraint is merely incidental to another, separate crime." (Citations omitted; internal quotation marks omitted.) *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 92–93.

For the purpose of evaluating harm in light of this factor, our Supreme Court in *Hinds* distinguished cases in which a defendant restrained the victims for a longer period of time and confined or moved the victims to a greater degree; *State* v. *Hampton*, supra, 293 Conn. 456, 463–64 (defendant confined victim for approximately three hours before committing substantive crime); *State* v. *Jordan*, 129 Conn. App. 215, 222–23, 19 A.3d 241 (defendant committed substantive crime during forty-five minute period and employed restraint significantly greater than necessary to commit substantive crime), cert. denied, 302 Conn. 910, 23 A.3d 1248 (2011); *State* v. *Strong*, 122 Conn. App. 131, 143, 999 A.2d 765 (defendant restrained victim for more than one hour in multiple locations after making threats), cert. denied, 298 Conn. 907, 3 A.3d 73 (2010); *State* v. *Nelson*, 118 Conn. App. 831, 860–62, 986 A.2d 311 (defendant assaulted victim, then confined victim for several hours in several locations), cert. denied, 295 Conn. 911, 989 A.2d 1074 (2010); from cases in which a defendant restrained the victims for a shorter period of time and subjected the victims to limited confinement or movement, as in *State* v. *Flores*, supra, 301 Conn. 81–82, 89 (defendant's robbery and confinement of victim lasted between five and twenty minutes and remained limited to singular location), and *State* v. *Thompson*, 118 Conn. App. 140, 144, 162, 983 A.2d 20 (2009) (defendant confined victim and committed other substantive crime within fifteen to twenty minute span and subjected victim to limited movement), cert. denied, 294 Conn. 932, 986 A.2d 1057 (2010). See *Hinds* v. *Commissioner of Correction*, supra, 92–93. The Supreme Court concluded that, "where kidnapping and multiple offenses occur closer in time to one another, it becomes more difficult to distinguish the confinement or restraint associated with the kidnapping from another substantive crime." (Internal quotation marks omitted.) Id., 93.

As we have noted, approximately ten minutes passed between when the defendant gained control of the Jeep at the gas station and when the defendant allowed the victims to exit the vehicle, indicating that the victims were restrained for ten minutes. Although, on its face, a ten minute period of confinement appears to fall within the latter line of cases recognized by our Supreme Court, rather than the former; see id., 91–93; we note that, for the commission of the larceny, the defendant only needed to, "with intent to deprive another of property . . . wrongfully [take], [obtain] or [withhold] [the Jeep] from [its] owner. . . ." General Statutes § 53a-119; see also General Statutes § 53a-123 (a) (1). The larceny statute under which the defendant was convicted did not require that he continuously operate the vehicle for some specified amount of time after taking it; the defendant could have stopped the vehicle one block or two blocks away from the gas station to release the victims without frustrating his commission

of the larceny.[6] The degree to which the defendant moved the restrained victims; see *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 92; further supports the state's position. Although, as the defendant contends, the kidnappings and the larceny commenced at the same time, and, by implication, at the same location, he transported the victims on Route 10 in Southington, onto an interstate highway, and on the highway some distance. Put differently, the defendant moved the victims to multiple locations while they were confined to the vehicle. Thus, we conclude that the first factor weighs in favor of the state.

We next address the second relevant *Salamon* factor, that is, whether the movement or confinement occurred during the commission of the separate offense. The state argues that this factor weighs in its favor because the defendant completed the larceny *before* he confined and moved the victims, which the state asserts substantiated the kidnapping charges. The state specifically argues that, once the defendant took possession of the Jeep with the intent to deprive the true owner of it permanently, he successfully satisfied each element of larceny. See *State* v. *Hayward*, 169 Conn. App. 764, 772–73, 153 A.3d 1 (2016), cert. denied, 324 Conn. 916, 154 A.3d 527 (2017). Accordingly, it is the state's position that any additional action the defendant took, specifically, confining and moving the victims for the ten minutes that followed his gaining control of the Jeep at the gas station, was not necessary to accomplish the already completed offense of larceny. The defendant contends that he restrained the victims *while* committing the larceny because he took control of the Jeep while the victims were already inside and fled the scene with the victims in the vehicle.

Our Supreme Court's analyses in *Banks* and *Bell* v. *Commissioner of Correction*, 339 Conn. 79, 259 A.3d 1073 (2021), guide our analysis in the present case. In *Banks*, the petitioner was convicted of multiple counts of kidnapping in connection with the robberies of two retail stores. *Banks* v. *Commissioner of Correction*, supra, 339 Conn. 5, 10. During both robberies, the petitioner took money from the stores' cash registers while brandishing a gun, then subsequently moved and confined the store employees in the stores' bathrooms before he fled the scenes. Id., 5–9. At the defendant's criminal trial, the court failed to provide a *Salamon* instruction to the jury, and, on review,[7] the habeas court concluded that the instructional error was harmless because the conduct that gave rise to the kidnapping convictions occurred after the petitioner had completed the robberies. Id., 13.

Our Supreme Court, evaluating whether the trial court's failure to provide an incidental restraint instruction constituted harmless error under *Brecht* v. *Abrahamson*, 507 U.S. 619, 623, 113 S. Ct. 1710, 123 L. Ed.

2d 353 (1993), analyzed whether the restraint occurred during the commission of the robberies. *Banks* v. *Commissioner of Correction*, supra, 339 Conn. 34, 39–40, 42–43. Our Supreme Court noted that the case before it presented "a distinct and novel scenario—asportation and confinement to facilitate a perpetrator's escape following the completion of a robbery"; id., 35; and characterized the case as "categorically distinct from . . . [its] prior *Salamon* cases insofar as the petitioner indisputably had accomplished the criminal objective of his underlying crimes prior to the commencement of the alleged kidnapping." Id., 39. Accordingly, our Supreme Court concluded, the robbery had been completed once the petitioner took the cash, not after he fled the scene. See id.

Our Supreme Court further determined: "Under such circumstances, there simply is no concern that the intent of the legislature will be frustrated by prosecuting a defendant for kidnapping solely on the basis of the restraint inherent in or necessary to accomplish the underlying crime. Many if not most robbers choose to leave the scene immediately upon obtaining the fruits of their crime. . . . [A] perpetrator's choice to remain at the crime scene and further restrict a victim's liberty after having robbed him or her manifests independent, criminal significance." Id. Because the petitioner confined the victims *after* he had taken the cash, his restraint of the victims did not occur during the commission of the separate offense. See id., 43 ("[t]he [kidnapping] conduct at issue occurred after the objective of the robbery had been completed"). In *Bell*, our Supreme Court summarized its holding in *Banks*, stating: "[W]hen it is clear that a perpetrator forcibly moved and restrained his victims *after having taken their property*, for the apparent purpose of escaping undetected and unhindered from the scene of the robbery, a reviewing court typically may conclude *as a matter of law* that such conduct bears independent criminal significance and is not merely incidental to the underlying robbery." (Emphasis altered.) *Bell* v. *Commissioner of Correction*, supra, 339 Conn. 92.

In *Bell*, the petitioner was convicted of two counts of kidnapping in connection with the robberies of two restaurants. Id., 83, 85. During the first robbery, the petitioner, after stating that he had a gun, instructed a restaurant employee to open the restaurant's safe. Id., 83. While he looted the safe, he confined the employee in the walk-in refrigerator of the restaurant.[8] Id., 83, 93. After looting the safe, he required that the employee remain confined in the refrigerator for a period of time. Id., 83–84. During the second robbery, the petitioner, while appearing to brandish a gun, instructed a restaurant employee to open the restaurant's safe and, *before* extracting money from the safe, instructed her to get into the restaurant's walk-in cooler. Id., 84. The petitioner told the employee that he would "let [her] know

when he was finished and when it was safe to come out" and, after waiting several minutes, the employee exited the refrigerator. (Internal quotation marks omitted.) Id. At the petitioner's criminal trial, which was held six years prior to the decision in *Salamon*, the court failed to provide a *Salamon* instruction to the jury. Id., 83, 86. On review, after our Supreme Court determined that *Salamon* applied retroactively, the habeas court concluded that the instructional error was harmless because the petitioner's confinement of the victims was not inherent in the robberies themselves and, by contrast, the petitioner confined the victims to reduce the risk that he would be detected. Id., 87–88.

Like in *Banks*, our Supreme Court in *Bell* evaluated whether the court's failure to provide an incidental restraint instruction constituted harmless error and specifically considered whether the restraint occurred during the commission of the robberies. Id., 92–93. Our Supreme Court stated that, "[u]nlike in *Banks*, the jury in the present case reasonably could have found that the petitioner [confined each employee] . . . not to facilitate his postrobbery escape but, rather, to incapacitate them while he completed the robberies. The petitioner informed the police that he took the money from each safe while the victims were restrained . . . . [The employee of the second restaurant that the petitioner robbed] seemed to confirm that account of events, indicating that the petitioner ordered her into the [cooler] immediately after she had opened the safe, and that he stated that he would release her when he was finished, presumably meaning after he was finished emptying the safe. Although [the employee of the first restaurant that the petitioner robbed] testified that the petitioner had ordered her into the refrigerator after he finished looting the . . . safe, she did not directly witness him taking the contents of the safe, and the jury might well have credited his statement that, consistent with his modus operandi in the [second] robbery, he waited to empty the safe until [the employee] was incapacitated so he could do so unobstructed. At the very least, defense counsel should have had the opportunity to make such an argument." (Internal quotation marks omitted.) Id., 92–93. Thus, the Supreme Court concluded, "[i]f a victim is restrained *in the midst of a robbery*, rather than *after the victim's property has been taken*, then it rarely will be possible to say, as a matter of law, that the restraint bore independent criminal significance and was not merely incidental to the completion of the underlying crime." (Emphasis added.) Id., 93.

The present case presents a situation that does not fall squarely into either of the categories described in *Banks* or *Bell*. In this case, the defendant did not restrain the victims in the middle of the larceny or after having taken the Jeep; see id.; but, instead, he took possession of the Jeep at approximately the same time he first

restrained the victims—when he got into the Jeep and drove it out of the parking lot of the gas station. Thus, unlike in *Banks* or *Bell*, the larceny and the initial restraint of the victims appear to have taken place at approximately the same time. We conclude, however, that, because the defendant took the Jeep and initially restrained the victims almost simultaneously, the second factor weighs in favor of the defendant.

We next address the third relevant *Salamon* factor, namely, whether the restraint was inherent in the nature of the other substantive offense. The state argues that the restraint of the victims was not inherent in the larceny of the Jeep and, accordingly, the restraint was neither incidental to nor necessary for the commission of the larceny. The state contends that the defendant was consciously aware of the victims' presence in the car, and he nonetheless confined and moved the victims for ten minutes to facilitate his escape from the scene without being apprehended by the police. The defendant argues that the restraint was inherent in the nature of the larceny because the defendant could not have taken the Jeep and escaped the scene without restraining the victims.

As this court explained in *White*, "our Supreme Court [in *Fields*] expressly rejected the notion that the rationale of *Salamon* is not implicated merely because restraint of the victim is not an essential element of the other substantive offense charged along with kidnapping." *White* v. *Commissioner of Correction*, supra, 170 Conn. App. 436. "On the contrary, restraint may be used in the commission of the underlying offense . . . even though it is not an element of that offense. Thus, depending on the facts of the underlying crime, the fact finder reasonably might conclude that the kidnapping was merely incidental to the underlying crime irrespective of whether that crime requires the use of restraint." *State* v. *Fields*, supra, 302 Conn. 248. Because restraint is not an essential element of larceny in the second degree; see General Statutes §§ 53a-119 and 53a-123 (a) (1); we consider "whether restraint was inherent in the nature of the [larceny] in this particular case." *White* v. *Commissioner of Correction*, supra, 436.

In light of our review of the record, we conclude that the defendant's restraint of the victims was not inherent in the nature of the larceny of the Jeep. After exiting the parking lot of the gas station at a high rate of speed, the defendant drove away from the scene erratically for ten minutes. The defendant continued driving erratically throughout the duration of the drive, despite M's pleas that the defendant not hurt her grandchildren, and confiscated M's cell phone, preventing her from calling for assistance. He did not stop at any point to let the victims free, despite acknowledging their presence in the vehicle by stating that he would not hurt them, until he had merged onto and driven some dis-

tance on the highway.

To the extent the defendant contends that, had he allowed the victims to exit the vehicle at the scene or shortly thereafter, he could not have successfully taken the Jeep because he would have been apprehended by the police, we note that the mere fact that the restraint *facilitated* his commission of the larceny does not mean that the restraint was *incidental to* or *necessary for* the completion of the larceny. Although the defendant escaped from the scene without delay because he did not stop to let the victims out of the Jeep at the gas station or shortly thereafter, his taking of the Jeep would not have been frustrated had he released the victims at any point immediately after taking the Jeep. See *Banks* v. *Commissioner of Correction*, supra, 339 Conn. 40–41 ("There is nothing specific to—let alone inherent in—the crime of robbery about forcing someone at gunpoint to the back of a store and restraining them in a bathroom or cooler. That conduct could just as well follow, and facilitate the offender's escape from, a physical or sexual assault, or other crime. The purpose is to escape unhindered from a crime scene—which, presumably, is a goal of most criminals . . . ."). In other words, the defendant could have stolen the vehicle without restraining the victims for approximately ten minutes. The fact that he was more likely to be apprehended by the police at the gas station if he had permitted the victims to get out of the car immediately, or at any point shortly thereafter, does not compel a conclusion that the victims' restraint was incidental to or necessary for the commission of the larceny. Thus, we conclude that the third factor weighs in favor of the state.

With regard to the fourth relevant factor, whether the restraint prevented the victim from summoning assistance, the state argues that the defendant's restraint of the victims in a moving vehicle prevented them from exiting the vehicle to summon assistance. The state relies on the fact that the defendant withheld M's cell phone from her, further preventing her from contacting assistance while inside of the vehicle. The defendant argues that, because he released the victims in a place where they easily could summon help—on the side of a highway—his restraint of the victims did not prevent them from summoning assistance.

As we have explained, the defendant restrained the victims in a moving vehicle, which he operated in an erratic manner and at a high rate of speed, in Southington and on the interstate highway. The two minor victims were strapped into their booster seats, such that they could not escape without being unstrapped, and M could not exit the vehicle to summon assistance without opening the door of a moving car. Only after the defendant released the victims could M flag down a passerby to summon assistance. Further, the defendant

confiscated M's cell phone and did not return it to her, even after he let her exit the vehicle. Accordingly, we conclude that the fourth factor weighs in favor of the state.

With respect to the fifth relevant factor, whether the restraint reduced the defendant's risk of detection, the state argues that the defendant's restraint of the victims reduced his risk of detection because the defendant confined the victims inside of a moving vehicle, prevented M from calling the police to report the defendant's location, and left the victims on the side of a highway, rather than in a place of safety, so he could drive away without being detected. The defendant insists that he did not hide the victims. His eventual release of the victims, the defendant contends, in fact increased his risk of detection because the victims were able to contact the police once he released them.

As we explained in our analysis of the fourth relevant *Salamon* factor, the defendant transported the victims in a fast-moving vehicle and withheld M's cell phone, which prevented the victims from summoning assistance. Likewise, the defendant's transportation of the victims in a fast-moving vehicle and the withholding of M's cell phone prevented the victims from alerting the police to the defendant's location by exiting the vehicle or by calling for help. Moreover, as the defendant argued in his brief and as we noted in our analysis of the third relevant *Salamon* factor, because the defendant did not stop to free the victims at or near the scene, the defendant fled the scene unhindered. Although the defendant freed the victims in public—on a highway— he did not release the victims until he had driven away from the gas station for ten minutes, and he released the victims on the side of the highway, instructing them to exit quickly before he continued driving on the highway. The fifth factor, thus, weighs in the state's favor.

Finally, we address the sixth relevant *Salamon* factor, namely, whether the restraint created a significant danger or increased the victims' risk of harm independent of that posed by the separate offense. The state argues that the defendant's erratic driving and decision to leave the victims on the side of a highway exposed them to significant danger and increased their risk of harm, independent of that posed by the defendant simply taking the Jeep. The state also relies on the fear experienced by M, who fearfully handed her cell phone over to the defendant, and the grandchildren, one of whom was crying during the incident. The defendant contends that his restraint of the victims did not create a significant danger because the victims remained secured in their seats throughout the drive and that the defendant neither harmed nor threatened to harm them at any point during the period of confinement.

To start, we note that the defendant's restraint of the victims was indeed "especially dangerous"; *White* v.

*Commissioner of Correction*, 170 Conn. App. 438; even though there was no evidence presented to suggest that the defendant physically assaulted the victims. Nonetheless, the defendant confined the victims within a moving vehicle, which he operated in an erratic manner and at a high rate of speed, for ten minutes in order to evade arrest by the police. The defendant's attempt to elude the police by driving erratically and at high speeds posed a risk of danger to the victims. Had the victims been outside of the Jeep, as was W, when the defendant took it at the gas station, they would not have been subjected to any risk of harm presented by the defendant's erratic driving. Further, as we have explained, the defendant eventually released the victims from the vehicle onto the side of the highway, without exiting the highway, and refused to return M's cell phone to her before driving away. The defendant's decision to leave the victims on the side of an interstate highway, in and of itself, posed a risk of danger to which they otherwise would not have been exposed, namely, the risk that they could have been injured by a passing car.

Further, as our Supreme Court has explained, "the distinct danger that is relevant to the question of whether criminal conduct bears independent significance as kidnapping need not be physical danger. . . . Criminal conduct that inspires distinct fears or has a uniquely harmful psychological impact on the victim also qualifies." (Citation omitted.) *Banks* v. *Commissioner of Correction*, supra, 339 Conn. 46. In the present case, it is clear that the defendant's confinement and movement of the victims inspired distinct fear in them. While the defendant erratically operated the Jeep, M had to hold onto various parts of its interior, exhibiting the fear she experienced while confined within the car. When the defendant asked M whether she had a cell phone, M initially lied to him and stated that she did not have one, but she eventually surrendered her cell phone to him out of fear that the phone may ring. She additionally pleaded with the defendant not to harm her grandchildren and expressed that she was worried about them, reflecting her fear that he may harm them. Likewise, one of M's grandchildren was crying while in the Jeep. During the ride and once the victims were released, M attempted to calm both of her grandchildren, reflecting the distinct fear they experienced as a result of their restraint. In sum, therefore, we conclude that the sixth factor weighs in the state's favor.

Balancing the foregoing considerations,[9] we conclude that the state has persuaded us beyond a reasonable doubt that there is no reasonable possibility that the jury, properly instructed, would have reached a different result with respect to whether the defendant restrained the victims "with the intent necessary to qualify as kidnapping . . . and not simply to perpetrate the underlying" larceny. Id., 34. We therefore conclude that the defendant cannot prevail on this claim.

## II

The defendant next claims that there was insufficient evidence to support his conviction of three counts of kidnapping in the second degree.[10] With respect to this claim, the defendant makes two related arguments. First, the defendant asserts that, on the basis of the evidence presented at trial, no reasonable jury could determine that the state had proven beyond a reasonable doubt that he intended to abduct, or prevent the liberation of, the victims beyond that which was incidental or necessary to commit the larceny of the Jeep. Second, the defendant argues that no reasonable jury could determine that the state had proven beyond a reasonable doubt that he used or threatened to use physical force or intimidation to restrain the victims. We are not persuaded.

We begin our analysis by setting forth the well established legal principles for assessing an insufficiency of the evidence claim. "In reviewing the sufficiency of the evidence to support a criminal conviction we apply a [two part] test." (Internal quotation marks omitted.) *State* v. *Shin*, 193 Conn. App. 348, 357, 219 A.3d 432, cert. denied, 333 Conn. 943, 219 A.3d 374 (2019). "[W]e first must construe the evidence in the light most favorable to sustaining the verdict . . . ." *State* v. *Rhodes*, 335 Conn. 226, 229, 249 A.3d 683 (2020). "[E]stablished case law commands us to review claims of evidentiary insufficiency in light of all of the evidence [adduced at trial]. . . . In other words, we review the sufficiency of the evidence as the case was tried . . . . Accordingly, we have traditionally tested claims of evidentiary insufficiency by reviewing no less than, and no more than, the evidence introduced at trial." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Petersen*, 196 Conn. App. 646, 656, 230 A.3d 696, cert. denied, 335 Conn. 921, 232 A.3d 1104 (2020).

Second, we must "determine whether, on the basis of those facts and the inferences reasonably drawn from them, the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [jury's] verdict of guilty." (Citation omitted; internal quotation marks omitted.) *State* v. *Rhodes*, supra, 335 Conn. 229. Put differently, "before this court may overturn a jury verdict for insufficient evidence, it must conclude that no reasonable jury could arrive at the conclusion the jury did." (Internal quotation marks omitted.) Id., 233. Accordingly, "[a] party challenging the validity of the jury's verdict on grounds that there was insufficient evidence to support such a result carries a difficult burden." (Internal quotation marks omitted.) Id.

"Although the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense . . . each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt." (Internal quotation marks omitted.) Id. The jury, "[i]n evaluating evidence . . . is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [jury] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Shin*, supra, 193 Conn. App. 358. "Because [t]he only kind of an inference recognized by the law is a reasonable one [however] . . . any such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic, therefore, that [a]ny [inference] drawn must be rational and founded upon the evidence." (Internal quotation marks omitted.) *State* v. *Ervin B.*, 202 Conn. App. 1, 6, 243 A.3d 799 (2020).

In light of the foregoing legal principles, we turn to the sufficiency of the evidence as a whole, beginning with the elements of the offense for which the defendant was charged. Section 53a-94 provides in relevant part: "(a) A person is guilty of kidnapping in the second degree when he abducts another person. . . ." Section 53a-91 (2) defines " '[a]bduct' " to mean, in relevant part, "to restrain a person with intent to prevent his liberation by . . . (B) using or threatening to use physical force or intimidation." Section 53a-91 (1) defines " '[r]estrain' " to mean "to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent. . . ."

The defendant first argues that the evidence in the record is insufficient to prove beyond a reasonable doubt that he intended to prevent the victims' liberation beyond that which was incidental to or necessary for the commission of the larceny of the Jeep. Specifically, he argues that the evidence, namely, the testimony that established that the victims were already in the vehicle when the defendant arrived at the gas station, that the defendant did not further restrain the victims, and that the defendant told the victims that he would not harm them, indicated that his restraint of the victims was incidental to the larceny. The defendant also asserts that he did not restrain, harm, or threaten the occupants in any way beyond what was necessary to commit the larceny. Because, in connection with our resolution of the defendant's first claim, we concluded that the court's failure to provide a *Salamon* instruction to the jury was harmless error because there was no reason-

able possibility that a properly instructed jury would find that the defendant's restraint was incidental to or necessary for his completion of the larceny, it necessarily follows that a reasonable view of the evidence supports the jury's finding that the defendant intended to prevent the victims' liberation beyond that which was incidental to or necessary to complete the larceny and, consequently, the jury's verdict of guilty.

The defendant also contends that no reasonable fact finder could conclude that he used or threatened to use force or intimidation to restrain the victims. Specifically, the defendant argues that there is no evidence that he physically harmed or threatened to physically harm the victims. The defendant asserts that he never physically blocked M from exiting the Jeep before he drove out of the parking lot of the gas station, nor did he brandish a weapon or threaten M to prevent her from exiting the vehicle. Further, the defendant asserts that he did not use physical force to restrain L and O because they were already strapped into their booster seats when he entered the Jeep. In response, the state argues that the defendant used physical force to restrain the victims when he confined them in a moving vehicle for ten minutes and failed to permit them to get out of the car. The state notes that, during that time, M surrendered her cell phone to the defendant out of fear. Accordingly, the state contends, the jury reasonably concluded that the defendant intimidated the victims or, through his actions, implicitly threatened the use of force against them.

A defendant who uses force or threatens to use force "coerc[es] or comp[els] [the victim] by an actual or threatened act," to acquiesce to the defendant's demand. (Internal quotation marks omitted.) *State* v. *Tucker*, 226 Conn. 618, 650 n.37, 629 A.2d 1067 (1993). This court has held that the jury, in evaluating whether a defendant intended to restrain a victim by using threats of force or intimidation, may consider the victim's reasonable belief that, had she tried to escape his confinement, the defendant may have used force against her. See *State* v. *Morlo M.*, 206 Conn. App. 660, 688–90, 261 A.3d 68, cert. denied, 339 Conn. 910, 261 A.3d 745 (2021); *State* v. *Franko*, 142 Conn. App. 451, 461, 64 A.3d 807, cert. denied, 310 Conn. 901, 75 A.3d 30 (2013); see also *State* v. *Wideman,* 36 Conn. App. 190, 196, 650 A.2d 571 (1994) ("[t]he state of mind of the victim is a relevant consideration in" jury's evaluation of whether defendant restrained victim "by the threat of force" (internal quotation marks omitted)), cert. denied, 232 Conn. 903, 653 A.2d 192 (1995). In *State* v. *Myers*, 129 Conn. App. 499, 513–14, 21 A.3d 499, cert. denied, 302 Conn. 918, 27 A.3d 370 (2011), for example, this court, in affirming the jury's determination that the defendant had used the threat of force to restrain the victim, relied on a victim's testimony that she felt as if she had " 'no choice' " other than to comply with the

defendant's demand to get into a car.

The evidence admitted at trial in the present case, and the reasonable inferences from that evidence that the jury was permitted to draw, were more than sufficient to establish that the defendant used or threatened to use force or intimidation to restrain the victims. Contrary to the defendant's contention that he did not prevent M from exiting the Jeep, M testified that, to enter the Jeep, the defendant opened the passenger side door, next to where M was sitting, and climbed over M to get into the driver's seat. M and Ayotte testified that the defendant drove out of the parking lot of the gas station at a high rate of speed, and Ayotte's body camera footage documented that far less than one minute passed between the defendant arriving at the gas station in the minivan and exiting the gas station in the Jeep. M's grandchildren, L and O, were strapped into their booster seats in the backseat. M additionally testified that the defendant drove erratically and at a high rate of speed, such that she had to hold onto the Jeep's interior, and that the defendant drove the Jeep on the highway. From this evidence, the jury reasonably could have inferred that the defendant used force to prevent the victims from exiting the vehicle before he began driving and while the vehicle was in motion.

Further, M testified, she expressed to the defendant that she "just wanted [her grandchildren] to be safe," regardless of what the defendant had done. Having heard M's pleas, the defendant nonetheless did not allow the victims to exit the vehicle until after he had driven for ten minutes in total, at which point he pulled over on the side of the highway and instructed M to quickly exit the vehicle. M testified that she was worried about her grandchildren, one of whom was crying. M also testified that the defendant had asked her whether she had a cell phone and that she initially had lied to the defendant by stating that she did not have one. M, however, eventually surrendered her cell phone to the defendant, out of fear that the phone may ring. The jury reasonably could have inferred that M surrendered her only channel of communication because she feared that the defendant may have reacted by using force against her or her grandchildren, had the phone rang. Viewing the evidence in the light most favorable to sustaining the verdict, the jury reasonably could have inferred that the defendant intimidated or threatened to use force to restrain the victims and that M reasonably believed that, if she tried to escape her confinement, the defendant would use force against her or her grandchildren.

In sum, we are not persuaded that the evidence in the present case was insufficient to prove that the defendant intended to prevent the victims' liberation beyond what was incidental to or necessary for the successful completion of the larceny and that he used or threatened to use force or intimidation to restrain the victims.

We therefore conclude that there was sufficient evidence from which the jury reasonably could have found the defendant guilty beyond a reasonable doubt of each of the three counts of kidnapping in the second degree.

III

The defendant's final claim on appeal is that the court abused its discretion when it denied his requests to have his leg shackles removed during the trial[11] and violated his constitutional right to due process by requiring him to be shackled during the trial. Specifically, the defendant argues that the court's denial of his requests to remove his leg shackles without adequately explaining why it denied the requests resulted in the defendant being unfairly restrained, deprived him of his right to a fair trial and undermined his presumption of innocence.[12] The state argues that the court provided sufficient reasons to support its denial of the defendant's requests and, more importantly, the defendant failed to present evidence establishing that the shackles were visible to the jury. Because we find that the defendant has failed to meet his burden of proving that his leg shackles were visible to the jury, the defendant's claim necessarily fails.

The following additional procedural history is relevant to our resolution of this claim. On the first three days of jury selection on September 11, 13 and 16, 2019, the defendant requested that his handcuffs be removed, and, on confirming with the judicial marshals that there existed no security concern, the court granted each request. The court noted on September 11 and 13, 2019, that the defendant's legs remained shackled and that his leg shackles were not visible to the venirepeople. On September 16, 2019, a judicial marshal characterized the defendant's behavior as "[g]reat." On September 19, 2019, the court granted the defendant's request that his shackles be removed.[13]

The trial began on September 23, 2019. During a midtrial recess on the first day of trial, counsel for the defendant requested in chambers that the defendant's leg shackles be removed. On the record, the court asked the judicial marshals whether they had any safety or behavioral concerns, and the judicial marshals answered that the defendant had not presented any issues. Accordingly, although the court noted that it believed that his leg shackles were not visible to the jury, the court granted the defendant's request and ordered that the leg shackles be removed. A judicial marshal asked the court whether the defendant's legs should remain unshackled for the duration of the trial, and the court clarified that it would reevaluate whether to remove the defendant's leg shackles on each day of the proceedings, at the request of the defendant.

On September 24, 2019, and outside of the presence of the jury, the defendant requested that his leg shackles

be removed. The court stated that, on the basis of its conversations with the parties that morning, it anticipated that certain testimony the state planned to elicit from one of its witnesses could produce an emotional reaction from the defendant.[14] The court noted that, although it did not "have a crystal ball," it would be easier to prevent an emotional reaction than to remediate any consequences of one. Consequently, the court denied the defendant's request.

Counsel for the defendant expressed to the court that the defendant was "concerned" that, on the previous day, one of the jurors had seen the shackles. The court, however, explained that, earlier that day, it had instructed one of the judicial marshals to sit in various chairs in the jury box, including in two chairs near the counsel's tables, to determine whether the leg shackles were visible to any juror. The judicial marshal confirmed that the leg shackles were not visible from the various seats in the jury box.

The trial resumed, and, on September 26, 2019, the defense rested. The following day, before the commencement of closing arguments and jury instructions, the defendant once again requested that his leg shackles be removed. The court denied the defendant's request, providing as reasons for its decision that the defendant would not "be moving around the courtroom" during closing arguments and jury instructions, that his leg shackles were not visible to the jury, and that he was not wearing hand shackles.[15]

We begin by setting forth the legal principles that govern our analysis of this claim, including the applicable standard of review. "[I]n reviewing a shackling claim, our task is to determine whether the court's decision to employ restraints constituted a clear abuse of discretion." (Internal quotation marks omitted.) *State* v. *Brawley*, 321 Conn. 583, 589, 137 A.3d 757 (2016).

"Central to the right to a fair trial, guaranteed by the [s]ixth and [f]ourteenth [a]mendments [to the United States constitution], is the principle that one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." (Internal quotation marks omitted.) *State* v. *Marcus H.*, 190 Conn. App. 332, 345, 210 A.3d 607, cert. denied, 332 Conn. 910, 211 A.3d 71, cert. denied,    U.S.   , 140 S. Ct. 540, 205 L. Ed. 2d 343 (2019). "[C]ourts must be alert to factors that may undermine the fairness of the fact-finding process. In the administration of criminal justice, courts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Woolcock*, 201 Conn. 605, 613, 518 A.2d 1377 (1986). Thus, "[i]n order for a criminal defendant to

enjoy the maximum benefit of the presumption of innocence, our courts should make every reasonable effort to present the defendant before the jury in a manner that does not suggest, expressly or impliedly, that he or she is a dangerous character whose guilt is a foregone conclusion." (Internal quotation marks omitted.) *State* v. *Webb*, 238 Conn. 389, 455, 680 A.2d 147 (1996).

Accordingly, "[i]t is well established that, [a]s a general proposition, a criminal defendant has the right to appear in court free from physical restraints. . . . Grounded in the common law, this right evolved in order to preserve the presumption favoring a criminal defendant's innocence, while eliminating any detrimental effects to the defendant that could result if he were physically restrained in the courtroom. . . . The presumption of innocence, although not articulated in the [c]onstitution, is a basic component of a fair trial under our system of criminal justice." (Internal quotation marks omitted.) *State* v. *Brawley*, supra, 321 Conn. 587. As this court explained in *Marcus H.*, "the United States Supreme Court [in *Deck* v. *Missouri*, 544 U.S. 622, 628, 125 S. Ct. 2007, 161 L. Ed. 2d 953 (2005)] stated that . . . [c]ourts and commentators share close to a consensus that, during the guilt phase of a trial, a criminal defendant has a right to remain free of physical restraints *that are visible to the jury*; [and] that the right has a constitutional dimension . . . ." (Emphasis in original; internal quotation marks omitted.) *State* v. *Marcus H.*, supra, 190 Conn. App. 347.

"Nonetheless, a defendant's right to appear before the jury unfettered is not absolute. . . . A trial court may employ a reasonable means of restraint [on] a defendant if, exercising its broad discretion in such matters, the court finds that restraints are reasonably necessary under the circumstances." (Internal quotation marks omitted.) *State* v. *Brawley*, supra, 321 Conn. 587. For example, a defendant's "right to remain free of physical restraints that are visible to the jury . . . may be overcome in a particular instance by essential state interests such as physical security, escape prevention, or courtroom decorum." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Marcus H.*, supra, 190 Conn. App. 347, quoting *Deck* v. *Missouri*, supra, 544 U.S. 628. Because "[a] trial judge has a duty to do what may be necessary to prevent escape, to minimize danger of harm to those attending trial as well as to the general public, and to maintain decent order in the courtroom . . . [s]hackles may properly be employed in order to ensure the safe, reasonable and orderly progress of trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Woolcock*, supra, 201 Conn. 614.

"Despite the breadth of [the court's] discretion, however, [t]he law has long forbidden routine use of *visible* shackles during the guilt phase . . . ." (Emphasis added; internal quotation marks omitted.) *State* v.

*Brawley*, supra, 321 Conn. 587. "[T]he [United States Supreme] [C]ourt held [in *Deck* v. *Missouri*, supra, 544 U.S. 629] that the [f]ifth and [f]ourteenth [a]mendments prohibit the use of physical restraints *visible to the jury* absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." (Emphasis in original; internal quotation marks omitted.) *State* v. *Marcus H.*, supra, 190 Conn. App. 347.

Practice Book § 42-46 mandates in relevant part: "In ordering the use of restraints or denying a request to remove them, the judicial authority shall detail its reasons on the record outside the presence of the jury. The nature and duration of the restraints employed shall be those reasonably necessary under the circumstances. . . ." See also *State* v. *Brawley*, supra, 321 Conn. 589 ("a trial court must ensure that its reasons for ordering the use of restraints are detailed in the record" (internal quotation marks omitted)). Although a trial court is not mandated to conduct "an evidentiary hearing concerning the necessity for restraints," our "appellate review is greatly aided when a court develops the record by conducting [such] an evidentiary hearing . . . ." (Internal quotation marks omitted.) Id.

If "a court, without adequate justification, orders [a] defendant to wear shackles that *will be seen* by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation. The [s]tate must prove beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained." (Emphasis in original; internal quotation marks omitted.) Id., 588–89. "The negative connotations of restraints, nevertheless, are without significance unless the fact of the restraints comes to the attention of the jury." (Internal quotation marks omitted.) *State* v. *Webb*, supra, 238 Conn. 455. "[T]o establish that he was deprived of his right to a fair trial, the defendant . . . must provide evidence demonstrating that the jury actually saw or otherwise was aware of his restraints." *State* v. *Brawley*, supra, 321 Conn. 590–91. "The defendant bears the burden of showing that he has suffered prejudice by establishing a factual record demonstrating that the members of the jury knew of the restraints." (Internal quotation marks omitted.) Id., 588.

In light of the foregoing legal principles, we remind courts to follow the prescriptions of Practice Book § 42-46 and to articulate the reasons that support a court's decision to order the use of, or to deny a defendant's request to remove his, leg shackles, regardless of whether the shackles are visible to the jury. See Practice Book § 42-46. We also emphasize the constitutional dimension inherent in a defendant's right to remain free of physical restraints that are visible to the jury during the guilt phase of his trial. See *State* v. *Marcus H.*, supra, 190 Conn. App. 347.

Turning to the present case, our review of the record reveals no evidence to suggest that the jurors actually saw or otherwise knew of the defendant's leg shackles. See *State* v. *Brawley*, supra, 321 Conn. 592. Although defense counsel expressed to the trial court on one occasion that the defendant was "concerned" that one of the jurors had seen his leg shackles, the defendant pointed to no evidence, neither to the court nor in his brief to this court, to support that any juror could see the shackles.[16] By contrast, the court instructed a judicial marshal to sit in various chairs in the jury box to assure that the defendant's leg shackles were not visible to the jury. Because the defendant has failed to satisfy his burden of demonstrating that members of the jury actually saw or otherwise were aware of his restraints, he has failed to establish that the court's denial of his requests deprived him of his right to a fair trial, and, accordingly, his claim fails.[17]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] At some point prior to trial, Renaldi and the defendant were incarcerated in the same correctional facility. Renaldi testified at trial that, during this period of incarceration, the defendant asked him to recant his statement identifying the defendant as the driver of the Jeep. Initially, Renaldi recanted his statement, but he later executed a cooperation agreement under which he agreed to testify at trial against the defendant.

[2] The robbery charge of which the defendant was acquitted related to his taking of the Jeep. During oral argument before this court, the state clarified that it did not charge the defendant with any crimes related to the robbery of the bank.

[3] In previous *Salamon* cases, our Supreme Court and this court have used a phrase that our Supreme Court refers to as *Salamon*'s " 'incidental and necessary test' "; *Banks* v. *Commissioner of Correction*, supra, 339 Conn. 50–51; that is, that "[o]ur legislature . . . intended to exclude from the scope of the more serious crime of kidnapping and its accompanying severe penalties those confinements or movements of a victim that are merely *incidental to and necessary for* the commission of another crime against that victim." (Emphasis added.) *State* v. *Salamon*, supra, 287 Conn. 542. In *Banks*, however, our Supreme Court acknowledged that *Salamon*'s " 'incidental and necessary' " language has created "confusion among litigants and the lower courts" with respect to whether "a defendant [is] entitled to *Salamon*'s protections if *either* prong of the [incidental and necessary] test applies (if, for example, restraint of the victim was incidental to a sexual assault but was not necessary to accomplish the assault)." (Emphasis added.) *Banks* v. *Commissioner of Correction*, supra, 50–51.

In evaluating "whether the incidental and necessary [language in *Salamon*] is to be understood as conjunctive or disjunctive"; id., 51; our Supreme Court stated that the terms "incidental to the underlying crime, necessary to commit the underlying crime, inherent in the nature of the underlying crime, and having no independent criminal significance . . . are merely different ways of expressing the same concept, namely, whether the restraint imposed evidenced an independent criminal intent or subjected the victims to risks distinct from those necessarily entailed by or inherent in the underlying offenses." (Citations omitted.) Id., 54–55. Our Supreme Court concluded that "conduct that is wholly incidental to the commission of an underlying crime cannot qualify as kidnapping, *regardless of whether it is strictly necessary to commit that crime*." (Emphasis added.) Id., 54. Accordingly, the court confirmed that a defendant is entitled to *Salamon*'s protections if his actions are either incidental to *or* necessary to commit the underlying offense. See id., 51–54. Thus, throughout this opinion and in accordance with our Supreme Court's analysis in *Banks*, we use the phrase "incidental to *or* necessary for," as opposed to "incidental to *and* necessary for," the commission of another substantive crime.

[4] In *Banks*, a habeas proceeding, our Supreme Court adopted the harm-

lessness standard laid out by the United States Supreme Court in *Brecht* v. *Abrahamson*, 507 U.S. 619, 637, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993), under which "the harmlessness of constitutional errors is assessed according to whether the error had [a] substantial and injurious effect or influence in determining the jury's verdict. . . . The *Brecht* standard reserves the remedy of a new trial for errors resulting in actual prejudice, as distinguished from errors giving rise to a mere possibility of harm." (Citations omitted; internal quotation marks omitted.) *Banks* v. *Commissioner of Correction*, supra, 339 Conn. 15–16. The court, however, clarified that a reviewing court assesses harm according to the *Brecht* standard *only* "on collateral review"; id., 18; including in state habeas proceedings. Id., 5, 19. By contrast, a court assesses harm according to the *Neder* standard "on direct review," including in the direct appeal of a defendant's conviction. Id., 17. Thus, "it is undisputed that *Neder* is the proper standard" to assess harm on direct review of cases involving an instructional error pursuant to *Salamon*. Id.

[5] As this court noted in *White*, "[a]lthough we recognize that the factors enumerated in *Salamon* are not intended to constitute an exhaustive list of the possible factors that may be relevant in a given case, the parties have not identified any other factors relevant to the present case, and, thus, we limit our discussion to those factors expressly identified in *Salamon*." *White* v. *Commissioner of Correction*, supra, 170 Conn. App. 429 n.9.

[6] As we explain in our evaluation of the third *Salamon* factor, the mere fact that a defendant's unlawful actions facilitated his commission of a substantive crime does not necessarily mean that those actions were incidental to or necessary for the completion of that crime. In the present case, the mere fact that the defendant's confinement and movement of the victims facilitated his avoidance of immediate arrest for the larceny because it prevented him from being stopped by the police officers at the gas station does not necessarily mean that the restraint was incidental to or necessary for the successful completion of the larceny.

[7] Although the defendant was convicted of the robberies in 1997, before our Supreme Court decided *Salamon* in 2008; see *Banks* v. *Commissioner of Correction*, supra, 339 Conn. 5, 11; "in *Luurtsema* v. *Commissioner of Correction*, 299 Conn. 740, 12 A.3d 817 (2011), [our Supreme Court] held that *Salamon* applies retroactively in habeas actions." *Bell* v. *Commissioner of Correction*, supra, 339 Conn. 87.

[8] We acknowledge that, earlier in its opinion in *Bell*, our Supreme Court stated that only "*after* the petitioner [had] finished looting the safe" did he order the employee "to proceed into the refrigerator." (Emphasis added; internal quotation marks omitted.) *Bell* v. *Commissioner of Correction*, supra, 339 Conn. 83. Later in its opinion, however, and as we note in this opinion, the Supreme Court clarified that "[t]he petitioner informed the police that [in each of the two robberies he committed] he took the money from each safe *while the victims were restrained in the refrigerators*." (Emphasis added.) Id., 93. The Supreme Court distinguished *Bell* from its opinion in *Banks* by emphasizing that, in *Bell*, the jury reasonably could have concluded that the petitioner confined the victims to incapacitate them "*while* he completed the robberies." (Emphasis added.) Id. Because the analysis of the Supreme Court hinges on this distinction, we rely on its conclusion that "the jury . . . reasonably could have found that the petitioner forced [the employee of the first restaurant that the petitioner robbed] . . . into the walk-in [refrigerator] not to facilitate his postrobbery escape but, rather, to incapacitate [her] while he completed the robber[y]." Id., 92–93.

[9] To the extent that the second factor cuts in favor of the defendant, we find that it does not trump the significance of the remaining factors that weigh in the state's favor.

[10] This court and our Supreme Court, in previous cases, have addressed claims of insufficient evidence *before* addressing other claims raised on appeal because, "if the defendant prevails on [his] sufficiency claim, [he] is entitled to a directed judgment of acquittal rather than to a new trial." (Internal quotation marks omitted.) *State* v. *Bagnaschi*, 180 Conn. App. 835, 840 n.3, 184 A.3d 1234, cert. denied, 329 Conn. 912, 186 A.3d 1170 (2018); see also *State* v. *Calabrese*, 279 Conn. 393, 401, 902 A.2d 1044 (2006). In the present case, however, we address the defendant's claims in the order in which they were raised in his principal appellate brief because our resolution of his first claim necessarily resolves one of the two arguments related to insufficiency of the evidence that he raised in his second claim.

[11] We note that, although the defendant argues in his brief that the court improperly required his legs to be shackled "during most of his trial," that

characterization is somewhat misleading. The court instructed the defendant to request that his shackles be removed on a day-by-day basis. The defendant requested the removal of his leg shackles on September 23, 2019, and the court granted his request. The defendant did not request that his leg shackles be removed on September 25 or 26, 2019, and, thus, it is unclear whether the court would have allowed the leg shackles to be removed on those days if asked.

[12] The defendant also argues that the court's denial of his requests to remove his leg shackles inhibited his ability to assist in his defense, noting that physical restraints generally may inhibit a defendant's ability to interact with counsel or affect his decision to testify. The defendant, however, neither argued nor pointed us to any evidence in the record to suggest that his leg shackles inhibited *his* ability to assist in his defense in this case.

[13] The record, however, is unclear whether the defendant requested that his hand shackles or his leg shackles be removed and, thus, whether the court granted the removal of the defendant's hand or leg shackles.

[14] On September 24, 2019, the state called four witnesses to testify: Renaldi, Sergeant Steve Cifone, Detective Adam Tillotson, and Officer Ryan Lair.

[15] Specifically, the court stated: "[The defendant is] not going to be moving around the courtroom. We've noted for the record previously that the shackles are not visible to the jury. He is not wearing hand shackles and this is, I think for today's purposes, the answer is no."

[16] The defendant also argues that the jurors may have heard the defendant's leg shackles. He has not pointed us to anywhere in the record to support this contention, and our review of the record has uncovered no evidence from which to conclude that the jurors heard the defendant's shackles at any point during the trial. Thus, with respect to this argument, the defendant has not met his burden of "demonstrating that the members of the jury knew of the restraints." (Internal quotation marks omitted.) *State* v. *Brawley*, supra, 321 Conn. 588.

[17] The defendant requests that we exercise our "supervisory authority" to require trial courts to conduct an evidentiary hearing to evaluate the necessity for restraints and, should the court determine that restraints are necessary, to create a record detailing the steps it took to assure that the jury is not aware of the restraints. The defendant argues that the protections afforded to him, namely, by the rules of practice and in our Supreme Court's decision in *Brawley*, are insufficient to ensure to him a fair trial and that the state should bear the burden of proving that the defendant's shackles were not visible to the jury.

As we have explained, our Supreme Court in *Brawley* specifically stated that courts need not conduct an evidentiary hearing to evaluate the necessity of restraints and that the burden lies with the defendant to provide evidence demonstrating that the jury was aware of his restraints. *State* v. *Brawley*, supra, 321 Conn. 589–91. "As an intermediate appellate court, we . . . are bound by the decisions of our Supreme Court." *Nogueira* v. *Commissioner of Correction*, 168 Conn. App. 803, 805 n.1, 149 A.3d 983, cert. denied, 323 Conn. 949, 169 A.3d 792 (2016). Accordingly, we decline to create such a rule because it is not the province of this panel to disregard binding authority of our Supreme Court.

———————————————————